# MARCH, 1939.

Rose Purcell, doing Business as the Isis Beauty Shop, Appellant, v. Journeymen Barbers & Beauticians International Union of America, Local 192-A, a Voluntary Association et al., Respondents.—133 S. W. (2d) 662.

Kansas City Court of Appeals.   May 29, 1939.

*Ralph S. Latshaw, Frank W. Aylward* and *Ralph S. Latshaw, Jr.,* for appellant.

846

*Clif Langsdale* and *Roy W. Rucker* for respondents.

KEMP, J.—This is a suit in equity, wherein plaintiff seeks to enjoin the defendants from picketing her business known as the Isis Beauty Shop located at 1019 East Thirty-First Street, Kansas City, Missouri, and from committing certain alleged unlawful acts in connection therewith. Upon a trial of the case on the merits, the trial court made a general finding denying to plaintiff the relief prayed for and dismissing plaintiff's petition. The specific grounds on which this decree was based do not appear inasmuch as the court made no findings of fact or conclusions of law.

The injunctive relief sought is based upon the allegations of the petition to the effect that the Journeymen Barbers and Beauticians International Union of America, Local 192-A, and the Hairdressers Guild, an organization of beauty shop owners, and various members or sympathizers of said organizations, have threatened and attempted to intimidate plaintiff by telling her that her life was not safe and that her property would be destroyed unless she complied with the requests of the defendants and the defendant associations, "and that

the defendants since the 6th day of December, 1937, have placed persons who are either members of the defendant associations or associated therewith, or sympathizers thereof, in groups in and about plaintiff's premises and in front thereof, and have placed said members or associates or sympathizers as pickets in front of plaintiff's place of business, which persons carry about their person and display to the public signs and placards to the effect that plaintiff employs non-union operators and is opposed to unions and organized labor, and circulate rumors that plaintiff is unfair to organized labor."

It is further alleged that defendants (including both the associations and a number of individuals who are members of one or the other of said associations and some non-members who were acting as pickets), their associates and sympathizers, have threatened to destroy plaintiff's said property and are interfering with plaintiff's business, and refuse to permit supplies and equipment to be delivered to plaintiff at her place of business, and on two occasions, to-wit, on October 29, 1937, and on November 12, 1937, windows in her place of business were broken and shattered; that the defendants "assemble in large crowds in and about plaintiff's place of business and loiter and congregate and pace back and forth in front of plaintiff's place of business, and that said pickets accost, coerce, and threaten plaintiff and plaintiff's patrons and other persons who desire to patronize plaintiff at her place of business;" that the plaintiff has repeatedly remonstrated with defendants and requested them to remove and recall said pickets from in front of and about plaintiff's premises and to cease to intimidate and threaten her and her patrons and customers and to "cease and desist from coercion and from circulating false rumors and reports regarding the status of her employees, and of interfering with the operation of her place of business, and that the defendants and each of them have refused so to do, and still continue to commit said unlawful, unwarranted, and illegal acts and actions to the great damage and irreparable loss of plaintiff."

It is further alleged that none of the defendants has ever been employed by plaintiff or has ever been discharged from employment by plaintiff, and that none of the members of the Journeymen Barbers and Beauticians International Union of America, Local 192-A, has ever been discharged from employment by plaintiff.

The petition further alleges that unless the defendant associations and the individual defendants are enjoined from continuing to threaten and intimidate plaintiff and from harassing and coercing plaintiff's patrons, and "from continuing to circulate false rumors and reports to the effect that plaintiff is a non-union shop and has labor difficulties, and from picketing, and unlawful acts of violence, and that she is opposed to unions and organized labor, she will suffer great loss and damages, and will be forced to close her place of business, depriving her of her right to work and earn a livelihood."

These allegations are followed by a prayer that injunction issue against the defendants ordering them to cease from interfering with plaintiff's peaceful possession and use of her premises and from assembling in or near her premises, whether on the street, sidewalk, entrance, or nearby, and from picketing and pacing back and forth in front of plaintiff's place of business and from intimidating or coercing plaintiff or her patrons, and for such other relief as to the court may seem proper.

Since we must pass upon the evidence in this case *de novo*, and in view of the sharp conflict in the evidence, we feel it essential that we set out the testimony in substantial detail.

Plaintiff testified that she had been engaged in the beauty shop business in Kansas City for the past fourteen years, and for the past eight years at her present location at 1019 East Thirty-First Street, Kansas City, Missouri, and at the time of the trial she was, and for some time prior thereto had been, employing fifteen beauty operators; that the first conversation she had with reference to her joining an organization of shop owners was a conversation with Mr. Elden Christmas on Sunday morning, August 29, 1937. This was a telephone conversation in which Mr. Christmas told plaintiff that he wanted her to serve on his committee to organize the beauty shop owners into a business organization. He told plaintiff that she would have to raise her prices and that she would not be permitted to give a permanent for less than $5. She asked him who was going to tell her she had to charge $5 for her permanents, whereupon he replied that "you will have all your window lights broken and they will all be in the street and you will be like at Price's Candy Company, 39th and Main, and Katz, and it costs $1600 to replace them, and you wouldn't be able to do that very often." The substance of this conversation was also testified to by plaintiff's husband who, at plaintiff's direction, listened in on an extension telephone.

Plaintiff testified to a second conversation with respect to this matter, stating that about the second week in September, Miss Myrtle Chapman and Mr. O. L. King (who, it later appears from the evidence, was Vice-President and Business Agent of the Hairdressers Guild) and another gentleman whose name she did not remember, called at her place of business at 8:30 in the morning, at which time Miss Chapman said, "Mrs. Purcell, we have come to talk to you about joining the Hairdressers Guild." Plaintiff replied that she was not interested, thereupon Mr. King said, "Well, you are interested in raising prices, aren't you?" Plaintiff replied, "No, sir, I am not, you folks are cutting your own throats but don't know it;" whereupon plaintiff went back to continue her work on a customer, and these parties left.

About two weeks after this second conversation, she had a third conversation, this time with Miss Chapman. On this occasion Miss Chapman told plaintiff that she wanted to talk to plaintiff's employees

about joining the union, to which plaintiff replied, "All right, but talk to them somewhere else." Miss Chapman replied that she had no intention of talking to them there because they were busy. This is the same Miss Chapman who, two weeks earlier, had appeared with Mr. King to urge plaintiff to join the Hairdressers Guild—the shop owners' organization—and from Miss Chapman's testimony it appears that on her second visit to plaintiff's place of business she was then representing not the shop owners, but the newly organized Beauticians Union, Local 192-A.

Some time during the night of October 28, 1937, two large windows in plaintiff's place of business were broken, and on the night of November 12, 1937, a third window was broken. The trial of this case began on December 21, 1937, and plaintiff testified that about three weeks prior to that time the picketing of her place began, and on the first day there were four to eight people walking in front of her shop and "they would manage to meet them (her customers) in front of the door and get right in front of them;" that the pickets ate their lunches in front of the shop and threw cartons and peanut hulls on the sidewalk and in the entrance, and littered and spit on the sidewalk; and that on one occasion during the deep snow after the entrance-way and sidewalk had been cleared of snow, one of the pickets shoveled a pile of snow into the entrance, thus requiring customers to wade through the snow in order to gain access to the shop; that pickets frequently "ganged up" in front of the entrance to the shop and would peer in the windows at customers.

Plaintiff's husband and five of plaintiff's employees testified as to the conduct of the pickets. The evidence on behalf of plaintiff in this respect was to the effect that most of the time during the picketing there were from six to eight people standing about in front of plaintiff's place of business, some of whom frequently walked back and forth in front of plaintiff's place of business with the two pickets who wore signs or placards; that the pickets would walk in front of customers as they approached the entrance to the beauty shop and would frequently block them off from the entrance, and would on occasions stop customers and converse with them; that the pickets and other persons apparently associated with the pickets in front of said shop would look into the windows of the shop and would stare and laugh and sneer at the people, both operators and customers, who were on the inside of the shop.

Plaintiff's husband testified he made repeated calls on the police for protection against these alleged unlawful acts of the pickets and others associated with them, but that the police never responded to his calls. On one occasion he went personally to the Nineteenth Street Police Station and then to Police Headquarters in an attempt to get protection, but to no effect.

Charlie Jones, colored porter or janitor at the Isis shop for the

previous three years, testified that he heard George W. Benton, who operates the Benton Beauty Shop just around the corner from plaintiff's place of business, state to some stranger in witness' presence and during the period that picketing was going on, that "they were going to wreck that beauty shop," referring to plaintiff's shop.

A number of the defendants, including several persons who had acted as pickets, categorically denied that there was any interference with any of plaintiff's customers in entering or leaving plaintiff's shop; denied that any of the pickets stared in the windows or sneered or made faces at the persons inside of the shop; denied that they littered or spit upon the sidewalk in front of plaintiff's shop, with the exception that a picket by the name of Embree admitted on a single occasion that he ate peanuts as he paraded in front of the shop and dropped the hulls on the sidewalk. The picket charged with having piled the snow in front of the entrance to the shop denied that any such act had occurred. Likewise, every named individual defendant denied that he knew anything of the breaking of the three windows in plaintiff's shop, and denied that he ever heard any threats or plan on the part of anyone to break said windows.

At the time the picketing of plaintiff's place. was begun none of plaintiff's employees was on strike nor had any of her employees made any complaint as to wages, hours, or conditions of employment. She was at the time paying her operators a straight salary of from $14 to $16 per week. Except on Saturday, the hours were nine and one-half hours per day, subject to additional time where a customers' beauty work had not been finished at seven o'clock, after which time (except on Saturday) no new work was commenced. On Saturday they continued to take customers till 8:30 P. M. On this point, however, one witness, Vera Melching, an operator who was employed at the Isis shop until November, 1937, and who was, at the time of the trial in December, employed at the Kresge Dime Store shop, testified that on Saturdays her hours at the Isis shop were from 8:00 A. M. to 9:00 P. M., with half an hour off for lunch.

Two of the defendants, Mr. Christmas and Mr. Cardwell, both shop owners and members of the Hairdressers Guild, testified to the effect that they employed operators on a 50 per cent commission basis—that is to say, the operators would receive 50 per cent of all that they took in from their own work, and that on this basis some of their operators earned more than the wage paid by plaintiff. Mr. Christmas, who was the moving figure in the Hairdressers Guild and the President of the Guild, employed his operators on a 50 per cent commission basis, with a guarantee of from $10 to $12 per week for those who did not have a following and $15 per week for those with a following, but the evidence also showed that he was paying one of his girls a straight salary of only $7 per week, with the permission to retain her tips which he estimated might run $3 per week, making a total of $10 per week.

Without going into further detail, the evidence does not justify the conclusion that plaintiff was paying her operators less than the general run of compensation paid by beauty shops in Kansas City. On the other hand, the evidence shows that plaintiff was paying her operators more than the guarantee which any of the owners who testified were willing to or did make to their operators. Vera Melching, who testified on behalf of the defendants, was employed at the Isis shop between May 6 and the first week in November, 1937. At the time she quit she was being paid by plaintiff $16 per week. She quit on account of a personal quarrel with another operator at the Isis shop and thereafter went to work at the Kresge Dime Store shop, where she was receiving $14 per week for a nine-hour day.

At the time of the picketing of plaintiff's premises, Miss Chapman, the Secretary-Treasurer of the Beauticians Union, testified that the union had not set either wages or hours, but stated that she thought if they could set a wage scale of from $12 to $14 per week to start with, they "would be doing very well." She did not testify as to what she thought the hours should be.

It was brought out in the evidence by defendants' counsel that the employees of the Isis Beauty Shop had organized, in the latter part of November, 1937, a shop union known as the "Isis Professional Hairdressers Association." The first organizing meetings were held at the home of one of the employees and later one meeting was held at the shop after plaintiff had left. Mr. Dickinson, an attorney, who so far as the record discloses had no relations with the plaintiff, was consulted and he prepared a set of by-laws for them. Officers were elected and four employees were appointed on grievance committee. The idea of a shop union was first discussed by six of the older girls, following newspaper articles with respect to the organization of such a union at the Donnelly Garment Company. Plaintiff testified that she did not know when the shop union was organized, and that the first she knew anything about it was the early part of December, 1937.

Further facts disclosed by the record will be referred to in the course of the opinion.

The law is well-settled in this state that peaceful picketing by labor organizations is permitted in any *bona fide* conflict with an employer of labor. [Church Shoe Company v. Turner, 279 S. W. 232, l. c. 236.] It is equally well-settled that the law does not permit the perpetration of unlawful acts in connection with picketing, and that in cases where picketing of an employer's place of business is accompanied by unlawful acts, the equity jurisdiction of our courts may be invoked to restrain it. [Joe Dan Market v. Wentz, 20 S. W. (2d) 567.]

The first question presented in this appeal is whether or not the picketing of plaintiff's premises was accompanied by unlawful acts committed by the defendants or by parties acting on their behalf or in confederation with them. Plaintiff's testimony, if taken as true,

offers ample basis for injunctive relief. The exercise of the equity powers of the courts, where picketing is accompanied by violence or other unlawful acts, in all the more imperative where, as here, the police failed to respond to appeals for protection. But, as heretofore pointed out, every unlawful act charged by plaintiff, with the exception of dropping some peanut hulls on the sidewalk on a single occasion, was denied by numerous witnesses testifying on behalf of the defendants. With the exception of the testimony as to the breaking of the windows, it would be most difficult for an appellate court to determine from the cold printed record where the weight of the testimony lay. We are not aided by the testimony of what may fairly be called a disinterested witness on either side of this controversy. In such a case, it has often been held, as was said in the case of Church Shoe Company v. Turner, 279 S. W. 232, l. c. 237, that where "the facts are conflicting and close, it is within our province to defer to the finding of the chancellor because of his better position to determine the credibility of the witnesses."

The chancellor, who had the opportunity to observe the witnesses and to note their manner on the stand, had a substantial advantage over this court in determining the credibility of the testimony of the respective witnesses. While in this case the chancellor made no specific findings of fact, we must assume that in his general finding in favor of the defendants he determined that the picketing was not accompanied by illegal acts. With reference to every unlawful act complained of, eliminating for the moment the breaking of the windows, we are unable to say from the record before us that the chancellor reached an erroneous conclusion in this respect.

The question as to whether or not the unlawful acts of breaking plaintiff's windows can be charged to defendants under the testimony in this case presents some difficulty. If we could accept as a fact the testimony of plaintiff and her husband that at the time she was first urged to join the shop owners' Guild, the invitation was accompanied with suggestions of violence of this character, in the event she declined the invitation, we believe undoubtedly that such a threat, followed by the breaking of her windows, would fairly give rise to the inference that the defendants were responsible for such unlawful acts. In undertaking to solve this question, we are again confronted by a record which discloses a denial on the part of Mr. Christmas that any such threats were made, which is quite as vigorous as the charge by the plaintiff that the threats were made. There is not a single disinterested witness testifying with respect to this fact, or any of the other controverted facts disclosed by the evidence. There is nothing in either the direct or cross-examination of the witnesses testifying pro or con on this question from which we could fairly say with only the printed record before us, that we should believe the one as against the other.

Plaintiff's husband testified that he attended the first meeting of the

Guild at which Christmas told of a barber shop that would not join the union and as a result his windows were broken. This testimony was disputed by witnesses on behalf of defendants. At a meeting of the Guild held on September 2, and only a few days after the meeting just mentioned, plaintiff's husband sent a shorthand reporter to take down a *verbatim* record of what occurred there. It appears that the transcript of the proceedings of this meeting was in the hands of plaintiff's counsel at the trial but no part of it was offered in evidence, although the reporter who took it testified at the trial. If it contained any threats of breaking windows, it is reasonable to assume this fact would have been put in evidence. Certainly such evidence would be most convincing.

Under the circumstances as above set out, again we feel that we should defer to the conclusion of the chancellor because of his more advantageous position from which to judge the credibility of the respective witnesses. Since, therefore, we do not feel justified in concluding that threats that plaintiff's windows would be broken were made prior to the time they were broken, we are confronted with the single fact that the windows were broken during the period of the picketing. Does this fact alone justify this court in the conclusion that the defendants are chargeable with this unlawful act? Defendants in their answer "deny any knowledge or complicity in the breaking of any windows in plaintiff's place of business, but assert that they believe said windows were broken by plaintiff or her agents for the purpose of making it appear that defendants were guilty, and for the basis of this suit." The record does not disclose a scintilla of evidence to support this suggestion and it seems to us that there is far less reason for this assumption than for the assumption that defendants were connected therewith. It does, of course, present a possibility and there is the further possibility that persons who were entire strangers to the defendants, or any of them, may have committed the acts. No case cited in the brief herein rules this point. Nor has an extensive search on our part disclosed any case which warrants the conclusion from the facts before us that defendants broke these windows.

Since we are unable to find as a fact that there were antecedent threats, our present view is that the fact that the windows were broken during the period of picketing, standing alone, without any direct evidence of any kind as to who broke them, does not justify the conclusion that defendants are chargeable with this unlawful conduct.

Plaintiff in her brief has cited numerous authorities in support of her contention that an injunction should issue in this case because of unlawful acts committed in connection with the picketing of her place of business. There is not the slightest question as to the duty of a court of equity to grant injunctive relief where the facts are as plaintiff contends they were here, but since we are unable to say from the

record before us that the chancellor who tried this case was in error in finding, in effect, that no illegal acts were committed, the cases cited in this connection are not in point and need not be discussed.

Plaintiff makes the further contention "that the defendants engaged in an unlawful conspiracy to fix minimum prices for beauty work and to force the plaintiff to join the Hairdressers Guild and to agree to the minimum prices so fixed by them."

In passing upon this contention, we must first determine what was the real purpose of the picketing. Was the purpose of the picketing, as plaintiff contends, to force plaintiff to join the Hairdressers Guild and to agree to minimum prices fixed by the Guild, or was it to further a genuine labor dispute between the Beauticians Union and the plaintiff with respect to wages, hours, or other conditions of employment? If the latter, then the Union was employing legitimate means for the accomplishment of their end, so long as the picketing was unaccompanied by violence or other unlawful acts, and this is true even though, as an incident thereto, plaintiff's business should sustain injury, as in this case it did. [Lohse Patent Door Co. v. Fuelle et al., 215 Mo. 421, l. c. 450, 451.]

In American Steel Foundries v. Tri-City Central Trades Council et al., 257 U. S. 184, l. c. 209, the United States Supreme Court, speaking through Chief Justice TAFT, said:

"Union was essential to give laborers opportunity to deal on equality with their employer. . . . The right to combine for such a lawful purpose has in many years not been denied by any court. The strike became a lawful instrument in a lawful economic struggle or competition between employer and employees, as to the share or division between them of the joint product of labor and capital. To render this combination at all effective, employees must make their combination extend beyond one shop. It is helpful to have as many as may be in the same trade in the same community united, because in the competition between employers they are bound to be affected by the standard of wages of their trade in the neighborhood. Therefore, they may use all lawful propaganda to enlarge their membership *and especially among those whose labor at lower wages* will injure their whole guild." (Italics ours.)

This seems to us a sound doctrine with which this court is in accord. Starting with this theory, and applying what we conceive to be the most enlightened, modern view as to the rights of labor to protect its best interests, we believe it fairly follows that if an employer is paying lower wages than are paid by other employers, the group or groups of employees enjoying the higher wage scale, with a view to protecting same, may use all lawful propaganda, including picketing, against such employer in an effort to compel him to meet the higher wage scale. With no suggestion of inclusive definition, such a situation would constitute a *bona fide* labor dispute. With this principle in view,

we shall at the cost of some repetition set out, in part at least, facts disclosed by the record bearing upon the question of the purpose or aim sought to be accomplished by the picketing in the case at bar, with a view to determining whether or not an actual labor dispute was here involved.

It will be recalled that Mr. Christmas first called the plaintiff by telephone, requesting her to act with him upon a committee to organize the Hairdressers Guild. According to his statement, the principal object of the Guild would be to increase prices throughout the city in the hairdressing business. Shortly after this telephone call by Mr. Christmas, who, upon its organization, became President of the Guild, Mr. King, the Business Agent of the Guild, and Miss Chapman called on the plaintiff in an endeavor to persuade her to join the Guild. It was here again suggested to plaintiff that the purpose of this organization was to raise prices for beauty work throughout the city. It will be recalled that Miss Chapman, who took weeks later called on plaintiff as the representative of the Beauticians Union, on this occasion was representing Mr. Christmas or the beauty shop owners and not any employees or labor organization.

The testimony of Leona Smith (who testified on behalf of the defendants) was to the effect that prior to her employment by plaintiff, for whom she had worked eight months and had quit only two weeks prior to the trial because of difficulties with another employee and not because of any dissatisfaction with wages, hours, or conditions of employment, she had been irregularly employed and for only short periods of time. She left plaintiff's employ and went to work for Mr. Christmas, the President of the Hairdressers Guild, where she worked on a commission basis of 50 per cent for the work that she did, with only a $10 per week guarantee. There was no evidence as to whether her commission exceeded the $10 guarantee. Her salary at plaintiff's shop was $14 per week at the time she quit. None of the employees of plaintiff was on strike and the evidence, without contradiction, indicates that her employees were satisfied with their wages, hours, and conditions of employment, or at least that they knew of no place where they could do better. None of plaintiff's former employees contended that the wage scale was below any guaranteed wage paid in Kansas City for such work.

As heretofore noted, Miss Chapman, the Secretary-Treasurer of the newly organized Beauticians Union, testified that no minimum wage scale had been determined upon by the union, but that she thought "if we get $12 to $14 (per week) to begin with, we would be doing very well." This is below the level of the fixed, regular wages then being paid by the plaintiff. She further testified that "we feel that if we establish *prices*, then we can set the wage later."

From the time of the organization of the Guild, and through the period of picketing, and up to the time of the trial of this case, there

were a number of interviews between Mr. Christmas, President of the Guild, and Miss Chapman, whom he had employed as an agent or representative of the Guild and who later became Secretary-Treasurer of the Beauticians Union.

Helen Miller, the President of the Beauticians Union, operates a beauty shop for her sister who is the proprietor of both a flower shop and a beauty shop in the same premises. She testified that since she became President of the Union, she had attended the meetings of the Hairdressers Guild, with a view to the owners and operators working together.

Mr. O. L. King, Business Agent of the Guild, testified that the primary purpose of the Guild was to get the beauty shop owners to agree on prices for beauty work.

Leona Clark, the former employee of plaintiff mentioned above, testified that on one occasion plaintiff announced to several of the employees a raise of $1 per week and at the same time said she did not believe in the union and that if they joined the union they might as well cancel their jobs. Plaintiff denied that she had ever stated to any of her employees that if they joined the union they could not work for her. Several of plaintiff's other employees denied that they had ever heard plaintiff make any such statement at the time mentioned or at any other time.

It seems to us that the evidence as a whole, and particularly Miss Chapman's own testimony, leads inescapably to the conclusion that the primary purpose of the picketing was to compel plaintiff to yield to the invitation to join the Guild and to agree with its members to raise her minimum price for a permanent wave from $1 to $3. (Plaintiff was then charging for different types of permanent waves, $1, $1.95, $3 and $5.) The idea of raising prices for beauty work did not originate with the union, but rather with the Hairdressers Guild and was its prime program. Furthermore, there was no assurance that in the event the prices were raised that the members of the union or the operators generally would reap a corresponding, or in fact any, benefit therefrom. Their interests, if thereby served at all, would be so remotely and uncertainly served that it would not afford a fair and reasonable basis for the contention that there was a labor dispute between the union and the plaintiff.

It would seem clear that the union could have no direct interest in the prices charged by a shop owner, unless it be to enable the shop owner to pay a fair wage or salary to her operators. No wage scale having been determined by the union at the time of the picketing, it of course cannot reasonably be contended that plaintiff was imposing a standard of wages below that fixed by the union as a fair wage. Union such circumstances, the union could have no fair basis of complaint against plaintiff, merely from the fact that she was able to operate her business on a price scale below that of her competitors.

The picture disclosed from the entire record in this case impels the conclusion that this was not, at least primarily, a labor dispute between the Beauticians Union and the plaintiff. It would seem, rather, that it was an attempt on the part of Mr. Christmas and other shop owners to use the union to coerce plaintiff into joining the shop owners' organization known as the Hairdressers Guild, and to join in agreement with the members thereof to increase her prices to a minimum fixed by them. How can it be said that plaintiff was unfair to labor with respect to the wages she was paying, first, when no wage scale had yet been named by the union and, second, when, notwithstanding this fact, the Secretary-Treasurer of the union, and apparently the most active officer of the union, testified that "if we get $12 to $14 to begin with, we would be doing very well." Plaintiff was at the time more than meeting this figure with a regular, guaranteed week-in-and-week-out salary of $14 to $16 per week, with full pay for holidays and a week's vacation with pay.

Subject to the right of labor to insist upon proper working conditions and upon what it deems to be reasonable hours and a fair return for the work of its hands, plaintiff has the right to conduct her business, free from interference, in any lawful manner she sees fit and to charge such prices as she may determine. This has frequently been held to be a property right which the courts will protect under proper circumstances by injunctive relief. A general statement of this rule is set out in 32 C. J. 155, paragraph 209, as follows:

"Since the right to carry on a lawful business without obstruction is a property right, acts committed without just cause or excuse, which interfere with the carrying on of complainant's business and destroy his custom, his credit, or his profits, do an irreparable injury and authorize the issuance of an injunction."

This rule was applied in the case of Lyle v. Amalgamated Meat Cutters and Butchers, Local No. 452 (Tenn.), 124 S. W. (2d) 701, decided February 18, 1939. In this case plaintiff was owner and operator of a retail grocery and meat market. The business was conducted by himself, his wife, and one grocery clerk. He employed no butcher, but cut his own meats. In his petition for injunction, he charged that defendants had urged him to sign a contract with the union, agreeing to operate a union butcher shop, to open and close his business at certain specified hours and to pay union wages. Defendants in their answer admitted that because of plaintiff's refusal to sign such contract they had placed a picket in front of his place of business, carrying a sign which read "Unfair to Butchers Union, Local 452," and admitted distributing circulars relating to their controversy with plaintiff and his failure to sign the contract. After hearing upon the merits, the trial court denied the injunction. In reversing the decision and holding that injunctive relief should be granted, the Supreme Court of Tennessee said, l. c. 703:

"In this particular cause the issue is a very simple one. The defendants do not object to complainant cutting his own meats provided he becomes a member of the Butchers' Union, and because of his refusal to adopt the so-called 'closed shop' agreement defendants began picketing his business for the purpose of coercing him to join the union, or, upon his continued refusal, to injure or destroy his business. Upon this particular question we find the authorities practically harmonious, the modern decisions being that the end sought by the picketing in these circumstances is unlawful." [Citing cases.] After citing a great number of cases from numerous jurisdictions in support of this position, the court further said, l. c. 704:

"Most of those decisions are based upon the principle that the right to conduct a lawful business is a property right, protected by the common law and guaranteed by the organic law of the state; and that when necessary to prevent irreparable injury an injunction will be granted to prevent third persons, who are not employees and have no contractual relations with the employer, from injuring or destroying his business by so-called peaceful picketing. Some of the cases are rested upon the theory that such picketing amounts to a nuisance and as such will be enjoined.

. . . . . . .

"We conclude therefore that complainant was deprived of his liberty and property as guaranteed to him by the 5th and 14th Amendments of the Federal Constitution, U. S. C. A., and Article 1, section 8, of the Constitution of Tennessee. . . ."

In the case of Hotel, Restaurant, etc. Local Union No. 181 v. Miller (Ky.), 114 S. W. (2d) 501, the hotel union Local No. 181, affiliated with the American Federation of Labor, was undertaking to unionize the employees of a restaurant owned and operated by Miller. When negotiations by Local 181 for a contract with employer became stalemated because of a closed shop provision therein, the employees organized a so-called "company union." The company union negotiated a contract with the employer. Thereupon the A. F. of L. union began picketing plaintiff's place of business, the pickets carrying placards bearing the statement that this employer was unfair to organized labor, etc. The court discussed certain provisions of the National Labor Relations Act and concluded that while the Federal statute was not applicable to this case, nevertheless the Congress, by this Act, had announced as the public policy of the Federal government, the rights of employees to organize in any manner they saw fit, including the right to organize as a company union, the court saying that "these declarations confirm the view that dealing with a company union is a fair labor practice." In holding the employer was entitled to injunctive relief under these circumstances, the court said:

"We may repeat that there existed no industrial dispute. The em-

ployer and a legitimate labor union had come to terms. There was a binding contract. These facts, it seems to us, make inapt the decisions of the courts either affirming or denying that there may be lawful picketing of a business which refused to unionize or against which no strike is in progress. Here the employer was not 'unfair to organized labor.' He had the right to be let alone. He was entitled to the law's protection from a third party's interference. The injunction was, therefore, properly granted.''

Culinary Workers' Union No. 331, et al. v. Fuller et al. (Texas), 105 S. W. (2d) 295, is quite similar to the Hotel, Restaurant, etc., Local Union No. 181 v. Miller case, *supra*, as to the facts. There was here involved, however, the Texas statute specifically authorizing peaceful picketing under certain circumstances which the defendant union contended were present in the case. The holding of the court is fairly stated in the syllabus, as follows:

''Granting of injunction restraining labor union and its agents from picketing restaurants in order to exclude prospective patrons and thus induce employees and restaurant owner to 'unionize' restaurant held proper, where there was no dispute or dissatisfaction between owner and employees and owner gave employees right to join union, notwithstanding statute authorizing 'peaceful picketing,' since statute was applicable only to strikes of employees, not to activities of third persons.''

In Hughes v. Kansas City Motion Picture M. O. Local No. 170, 221 S. W. 95, 282 Mo. 304, the owner of a motion picture theatre was operating his own projecting machine. The union demanded that he cease operating this machine and employ a union operator. Upon his refusal to comply with this demand, his place was picketed by the union. It was there held that plaintiff was entitled to injunctive relief. In passing upon this situation, the court said, l. c. (S. W.) 97:

''The controversy is not one wherein members of an organized body of employees have struck or taken other methods to increase their wages, shorten their hours of labor, or improve the sanitation and comfort of the conditions under which they work. It is not the outcome of any grievance of organized labor that contains merit, as involving resistance to oppression or an equitable division of profits yielded by labor and capital in combination. . . . The determination of the union to put the rule into effect against plaintiffs involved, as the course of events shows, the intention to coerce plaintiffs into observing it by reducing the income of their business to such an extent that they must yield or be ruined. The reduction was to be accomplished by a patrol of pickets in front of the theatre and repeated untrue statements by the pickets to patrons of the theatre and other passers-by that plaintiffs were unfair to organized labor, and by requests not to patronize them. . . . This conduct of the union, including the defendants, was a violation of the legal rights of the

plaintiffs, which worked continuous damage to their business and entitles them to redress. . . . Without denying that there can be peaceful picketing, as some courts have held, we dissent from the proposition that picketing is lawful, as a matter of course, simply because it is not accompanied by assaults, threats, or other methods of intimidation.''

In each of these four last cited cases, it was held that there was no *bona fide* labor dispute and that therefore an injunction should issue to protect the employer in his right to conduct his business without interference incident to picketing. It seems clear to us the facts in the case at bar present less substantial basis for the contention that a labor dispute is involved than do the facts in any of the four cases last cited.

To obviate any possible misunderstanding as to the position of this court with reference to what may constitute a labor dispute, we make this further observation with reference to the following language appearing in the quotation from the opinion in the case of Lyle v. Amalgamated Meat Cutters, *supra*, to-wit, ''and that when necessary to prevent irreparable injury an injunction will be granted to prevent third persons, who are not employees and have no contractual relations with the employer, from injuring or destroying his business by so-called peaceful picketing.'' As we have heretofore indicated, we do not concur in the view that the parties conducting picketing must *necessarily* have contractual relations with the employer as a condition precedent to a *bona fide* labor dispute. To the extent that the language of any decision cited herein proclaims such a doctrine, to that extent we do not agree. We have hereinabove pointed out a hypothetical situation wherein, *without any contractual relations between employer and those picketing* his place, the picketing, according to our view, may yet be justified upon the ground of a *bona fide* labor dispute. But in the case at bar, a careful study of every line of testimony in the record of more than 400 pages impels us to the conclusion that the picketing of plaintiff's premises was not in furtherance of a dispute with plaintiff as to wages, hours, or other conditions of employment, but that such picketing was conducted solely for the purpose of compelling plaintiff to enter into an agreement with her competitors to fix a minimum price for certain beauty work. Under such circumstances, it is our view that no actual labor dispute is involved here and that, therefore, there can be no justification for interference through picketing with plaintiff's right to conduct her business, free from interference, in any lawful manner she sees fit.

In view of what we have heretofore said, it is unnecessary for us to pass upon other points raised by appellant on this appeal.

It follows, therefore, that the judgment herein must be, and is hereby, reversed and remanded, with directions to the court to enter a decree enjoining, with the exception of Ivan Tubor, the answering,

individual defendants only, in conformity with the views herein expressed. All concur.

## ON MOTION FOR REHEARING.

PER CURIAM:—Defendants (respondents), in their motion for rehearing, contend that the court, in holding in its opinion that there was no actual *bona fide* labor dispute existing between the plaintiff and the Beauticians Union, failed to consider the evidence touching on, (a) wages, (b) hours of labor, (c) company dominated union, and (d) interference of rights of employees to join a union of their own choosing.

The chronicle of events antecedent to the picketing leads inescapably, we think, to the conclusion that the sole purpose of the picketing at that particular time was to compel plaintiff to join the Hairdressers Guild and to enter into an agreement with other members of the Guild to raise prices for beauty work, fixing $3 as a minimum price for the giving of a permanent wave.

These are the demands that were made upon plaintiff, and they are the, only demands that were made upon her. There is not a line of testimony to the effect that any representative of either the Guild or the union, or any other person, complained to plaintiff about the inadequacy of the wage she was paying or about the hours of labor that she was imposing, or that she was dominating the union formed by the employees of her shop, or that she was interfering with the rights of employees to join a union of their own choosing.

Miss Chapman testified that shortly after her first conversation with plaintiff, at which time she was a representative of the Hairdressers Guild, she called on plaintiff as a representative of the union. Referring to this second conversation with plaintiff, Miss Chapman testified:

"I went to her shop and told her I was in the union now and I was going to talk to her operators and I thought it was only the fair thing to do to tell her first, which I did. She said I couldn't talk to them in her shop. I said I would not expect to, because they were busy but I would talk to them after work some time, but I wanted to tell her first that I was going to do it."

This is all the testimony of any conversation with, or representations made to, plaintiff touching any subject other than the matter of raising prices in conformity with the plans of the Hairdressers Guild.

In the light of these facts, we are unable to see the slightest basis for the contention that the picketing was the result of any controversy other than the controversy with respect to plaintiff joining the Guild and agreeing to increase prices.

But there is another reason, which conclusively shows that this was not a labor dispute on account of either wages or hours. Miss Chapman, who, at the time of the picketing and at the time of the trial,

was secretary-treasurer of the Beauticians Union, testified unequivocally that the union had taken no action with respect to fixing a wage scale or determining a standard for hours of labor. Miss Chapman, on cross-examination, testified as follows:

"Q. Did they ever have a union scale for these beauty shop operators? A. Union scale. What kind of a scale do you mean?

"Q. Did the union ever have a scale?

"THE COURT: For the wages or the work?

"MR. AYLWARD: Wages and work both.

"MR. LANGSDALE: Do you mean here in Kansas City?

"MR. AYLWARD: Right here in Kansas City.

"MR. LANGSDALE: Or elsewhere.

"MR. AYLWARD: Right here in Kansas City.

"A. Well, I told you we hadn't decided on a wage for the operators.

"Q. (By Mr. Aylward) Then you haven't decided on the wage or or hours? A. No sir, no.

"Q. But you have decided on the price? A. We feel that if we establish prices, then we can set the wage later.

"Q. But you never have made an attempt to establish the wages or hours for their operators? A. They have talked about it at these meetings, but it isn't settled."

Since no complaint was made to plaintiff by the union or by any other organization or person, as to wages or hours or other conditions of employment, and since the union had not even determined upon any wage scale or standard of hours of labor at the time of the picketing, it must be clear that the picketing did not involve any dispute with relation to these matters.

Furthermore, Miss Chapman's statement that "if we establish prices, then we can set the wage later" seems to be a clear admission that the purpose of the picketing was to induce the plaintiff to increase prices charged for beauty work done in her shop, and had nothing to do, directly at least, with wages.

Respondents urge that we have overlooked the relation between the price charged for beauty work and the compensation to operators, inasmuch as the union was contending for wages based upon a fifty per cent commission. The assumption that this was the position of the union is not warranted from the testimony in the record, for, as heretofore pointed out, the union had taken no action on the matter of fixing a standard of wages. The testimony that comes the nearest to affording a basis for this contention is the following testimony adduced on cross-examination of Miss Chapman:

"Q. What is a living wage in your opinion for these operators? A. I think a girl that works should have—$20.00 a week is little enough to live on.

"Q. Minimum wage? A. We don't intend to ask that much at first.

"Q. What do you intend to ask? A. We thought if we got twelve to fourteen dollars to begin on we would be doing very well.

"Q. (By Mr. Langsdale) That is a minimum? A. Yes.

"Q. With a percentage of the work? A. Yes."

In view of this witness' preceding testimony that the union had not yet taken any action with respect to wages, it must be clear that this testimony could be nothing more than an expression of her personal opinion as to the position the union should take on this matter, rather than a recital of any position that the union had taken. It cannot be contended that the union had adopted the commission basis for the payment of wages as its standard, because the positive testimony is that the union had not acted in this particular at all.

Respondents challenge our statement in the opinion that Vera Melching quit "on account of a personal quarrel with another operator at the Isis shop." While we do not think this involves a matter in any way decisive of any issue in the case, we nevertheless deem it appropriate to set out the testimony on which the statement in the opinion was based. It is true that this witness testified on direct examination that she quit because the hours were too long and the work was too hard. On cross-examination, however, the record discloses the following questions and answers:

"Q. Why did you quit Mrs. Purcell? Did you quit on account of fighting with some other girls? A. The hours was too long and the work was too hard.

"Q. Did you—

"MR. LANGSDALE: Let her finish the answer.

"A. And another girl kept annoying me at my work, which I reported to Mrs. Purcell, and she discussed it with this girl, and told her to leave me alone. I understand she did. . . .

"Q. (By Mr. Aylward) When did you have this argument with Mildred McAfee? A. It was before Mrs. Purcell took sick. I don't know just when the first one was; but they were both gone the last time, and I reported it to the assistant manager.

"Q. When did you make the report? A. Wednesday, and I told her I was quitting."

From this we believe it is a fair conclusion that the immediate reason at least for her quitting was the reason stated in the original opinion.

Respondents cite a number of cases in support of their motion for rehearing, a number of which were cited for the first time in their brief in support of said motion. We have, however, examined all of the cases cited, and none of them appears to us to be in conflict with our opinion herein.

We believe all other points raised by respondents' motion which are pertinent to the issues in the case are sufficiently covered in the original opinion.

It follows that the motion for rehearing should be overruled. It is so ordered.