INDEPENDENT DAIRY WORKERS UNION OF HIGHTS-
TOWN, A CORPORATION, *ETC.*, *ET AL.*, PLAINTIFF, v.
MILK DRIVERS AND DAIRY EMPLOYEES LOCAL No.
680, *ETC.*, *ET ALS.*, DEFENDANT.

Superior Court of New Jersey
Chancery Division

Decided February 20, 1958.

*Messrs. Gross & Weissberger* (*Mr. Ernest Gross* appearing), attorneys of plaintiff.

*Mr. Thomas L. Parsonnet,* attorney of defendant Milk Drivers and Dairy Employees Local No. 680, *etc.*

*Mr. Edward W. Currie,* attorney of defendant Deckers Dairy, Inc.

FOLEY, J. C. C. (temporarily assigned). The factual synthesis involved in this litigation is amply set forth in the prior determination of the Supreme Court 23 *N. J.* 85 (1956), in which this court was reversed for its denial of a temporary injunction. Except to the extent that factual issues are specifically referred to and determined herein, the facts in support of the plaintiffs' claim for relief as set forth in the Supreme Court opinion may be taken to have been either satisfactorily proved or stipulated at the final hearing and are adopted by the court for fact-finding purposes.

On final hearing I am, of course, bound by the legal conclusions embodied in the Supreme Court opinion. But it is my obligation to determine factual disputes between the parties which may affect the issues to be presented in subsequent review of the controversy by appellate tribunals here or elsewhere. It is also the function of this court to pass upon such legal questions as may not have been the subject of previous adjudication.

The area of factual disputation presented is to be gleaned from the three opinions filed by the Supreme Court.

Mr. Justice Burling, speaking for the majority, defined the issues as follows:

"1—Does the picketing involved here infringe upon any right of the employees guaranteed by *N. J. Const.* 1947, *Art.* I, *sec.* 19?
2—Is the picketing involved here immune from restraint by virtue of the constitutional right of free speech?"

The gist of the court's holding was that the constitutional article providing that:

"*Persons in private employment shall have the right to organize and bargain collectively.* Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing."

dominated the provisions of the Anti-Injunction Act (*N. J. S.* 2A :15–51, *subd. e*).

The italics noted in the quoted portion of the constitutional article are in the hand of the Supreme Court and illuminate the rationale of the opinion, which I take to be, that the scope of legislative enactment may not intrude upon rights defined in the Constitution.

█ The factual hypothesis upon which the majority posited its opinion comprehended acceptance *pro tempore* of a showing that the plaintiff was a *bona fide* union in the sense that it was neither company-inspired nor company-dominated, and also the assumption that a "labor dispute" between the parties existed—the latter contingency being indispensable to the applicability of the Anti-Injunction Act.

The portion of the opinion which recites that:

"The case * * * proceed to final hearing in order to develop the full factual background and especially the charge, unsupported by any proof before us, that the Independent Union is a management product."

is a directive to this court to make factual findings on these matters.

As I read the dissent of Mr. Justice Heher, I gather that he did not share the majority view that *prima facie* the integrity of the plaintiff as a free agency of its members had been established. Moreover, his emphasis on the circumstances attending the discharge of four employees who were said to have been active in the defendant union leads me to believe that he had in mind that injunctive relief should be withheld pending a plenary hearing of the evidence touching upon these issues.

Mr. Justice Jacobs, in his concurring dissent, likewise expressed the thought that enjoinder should await a complete exposition of the facts.

1. COMPANY INSPIRATION OR DOMINATION OF THE PLAINTIFF UNION.

At the outset of the final hearing the defendant union declined to state unequivocally its position with respect to whether or not the plaintiff union was company-inspired or company-dominated. As to this issue, which evidently was

of serious concern to the entire Supreme Court, counsel, in response to interrogation by the court, which was as searching as the court felt was proper, said that no evidence would be offered by this defendant to traverse the claimed *bona fides* of the plaintiff as an entity independent of the employer and further, that no argument would be made that the plaintiff union was in these particulars other than what it purported to be. Accordingly, no evidence was introduced in the course of the hearing and no argument was made on this subject at the conclusion of the proceedings. In effect, this issue (if that it may now be called), after fulsome proof, went in the plaintiffs' favor by default. The resultant finding of fact is that the plaintiff union is a corporate body of full and complete integrity, created by the free exercise of the will of the entire employee personnel of the defendant company and designated by its creators as their sole bargaining agency.

■■ 2. The Existence or Non-Existence of a "Labor Dispute" at the Time of the Granting of the Injunction.

I find as a fact that the employees, Jack Hughes, Victor Van Hise, Vernon Van Hise and Frank Murray, were discharged by the defendant company wholly or in part by reason of their sympathies to the organizational objectives of the defendant union and their efforts to persuade co-employees to select it as their bargaining agency. My reasons are set forth at some length in the record and need not be repeated herein. In my opinion these discharges created a "labor dispute" within the meaning of the Anti-Injunction Act.

■ During the hearing counsel for the union conceded that a factual question is presented as to whether or not the union activities enjoined were a part of this particular labor dispute, making clear, however, his contention that a negative finding would not render the Anti-Injunction Act inoperative. It is plain that picketing was commenced hard upon the termination of Hughes' employment by the defendant company and it appears to have been an immediate consequence of that event. Picketing and similar activities continued

through and beyond the dates on which the other three men were dismissed from the company's service, and the inference may be drawn that these activities were associated with and related to the labor dispute which I have described. However, long prior to the hearing on the temporary injunction all four of these employees had taken other positions at increased pay, and I am satisfied from their testimony that none of them thereafter would have accepted reemployment by the defendant except upon condition that their wages would be substantially increased over what they were receiving when employed by the company, and upon the further condition that the defendant union be recognized as the sole bargaining agent of the company's employees. As a matter of fact, Hughes declined the company's offer of a job with increased pay within two weeks of his discharge. So it would seem that in these circumstances the "labor dispute" evoked by the discharges came to an end by volition of the defendant individuals, and further, that the primary purposes of the picketing activities to gain reinstatement of these individuals with back pay were thwarted by their retiring from the dispute. Thus, the picketing ceased to serve the lawful purpose in aid of which it was commenced.

With what, then, was subsequent picketing connected?

On May 4, 1956 the plaintiff union and defendant company entered a collective bargaining agreement in which the union was designated the sole bargaining representative of the employees. As previously noted, the *bona fides* of this union has been established beyond question and is tacitly acknowledged by the defendant. Necessarily, then, the contract was untainted and created a valid and subsisting obligation in the defendant company to refrain from "signing up" with any other union. This being true, the defendant union was without right to undertake any activity which was designed to influence the company to abrogate its contractual obligation or to deprive the plaintiffs of the benefits deriving therefrom. I find that it was precisely such activity in which the union was engaged after the discharged employees had gained employment elsewhere. The legend on the picket

signs, "Deckers' Dairy is not signed up with Milk Drivers and Dairy Employees Local 680 A.F.L.-C.I.O.," is consistent with no other rational determination.

A "labor dispute" cannot be said to arise by reason of the lawful rejection of an unlawful demand. This leads me to conclude that no "labor dispute" was in being at the time the injunction was ordered, and so that the provisions of the Anti-Injunction Act are inapplicable to this case.

But in the event that this legal conclusion is found to be erroneous, the end result will be unchanged. The record will reveal that counsel for the defendant conceded that this court, on the state of facts presented, is bound by the edict of the Supreme Court. In this I concur.

Judgment for the plaintiff will be entered in accordance with the prayers of the complaint and without modification of the terms of the temporary injunction.