[L. A. No. 25288. In Bank. Apr. 7, 1960.]

ROSS MESSNER, Respondent, v. JOURNEYMEN BAR-
BERS, HAIRDRESSERS AND COSMETOLOGISTS,
INTERNATIONAL UNION OF AMERICA, LOCAL
256, et al., Appellants.

874

Todd & Todd and Henry C. Todd for Appellants.

Carroll, Davis, Burdick & McDonough, Roland C. Davis, John E. Thorne, Johnson, Thorne, Speed & Bamford, Morgan, Beauzay, Smith & Holmes, Robert Morgan, Charles P. Scully and Victor Van Bourg as Amici Curiae on behalf of Appellants.

Gray, Cary, Ames & Frye and Ward W. Waddell, Jr., for Respondent.

Severson, Davis & Larson, Nathan R. Berke and George Brunn as Amici Curiae on behalf of Respondent.

TRAYNOR, J.—Defendants appeal from a judgment of the trial court enjoining them from picketing plaintiff's barber shop to secure a union shop agreement.

Plaintiff is a barber, working with the tools of the trade. During the summer of 1957 defendants attempted to organize all the barber shops in the San Diego area. They submitted a contract to plaintiff that would have required him and his four barber employees to join defendants' organization. Defendants did not represent any of plaintiff's employees, and the employees do not wish to join the union or to be represented by defendants. Plaintiff's refusal to sign the contract led to defendants' peaceful picketing. After about a week the pickets were removed by stipulation pending the decision in this case.

Since plaintiff is not engaged in interstate commerce, this case must be decided under state law. It is clear that "a union may use the various forms of concerted action, such as strike, picketing, or boycott, to enforce an objective that is reasonably related to any legitimate interest of organized labor. . . . It is equally well settled that the object

of concerted labor activity must be proper and that it must be sought by lawful means, otherwise the persons injured by such activity may obtain damages or injunctive relief." (*James* v. *Marinship Corp.*, 25 Cal.2d 721, 728-729 [155 P.2d 329, 160 A.L.R. 900] and cases cited.) If defendants' peaceful picketing was directed toward a proper object, the injunction was erroneously granted. The crucial issue in this case, therefore, is whether a closed or union shop agreement is a proper objective of a labor union that does not represent any of the employees directly involved.

That issue was decided in *C. S. Smith Met. Market Co.* v. *Lyons*, 16 Cal.2d 389 [106 P.2d 414], and *McKay* v. *Retail Automobile S. L. Union No. 1067*, 16 Cal.2d 311 [106 P.2d 373], and was reaffirmed in *Petri Cleaners, Inc.* v. *Automotive Employees, etc. Local No. 88, ante,* pp. 455, 474-475 [2 Cal. Rptr. 470, 349 P.2d 76]. ■ In the course of holding in the Petri case that an employer was not required to bargain collectively with a union representing a majority of his employees, this court said: "[w]e conclude that employers are not required by law to engage in collective bargaining and that closed or union shop agreements and concerted activities to achieve them are lawful in this state whether or not a majority of the employees directly involved wish such agreements." Since the concerted activities in the Petri case were conducted by a union that represented a majority of the employees at the time the activities began, we were there concerned with the issue of this case only inferentially. We deem it appropriate to set forth the law on this issue by a detailed discussion of the controlling authorities.

As early as *J. F. Parkinson Co.* v. *Building Trades Council* (1908), 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A. N.S. 550], this court held that it was not unlawful for a union to call a strike of employees and order a boycott to bring pressure on an employer who retained a nonunion worker and thereby to enforce a closed shop. The elimination of the competition of nonunion workers was held a proper objective of concerted labor activity, and the court was unanimous in holding a strike a proper method of attaining this end. The conclusion of the Parkinson case that a closed shop is a proper labor objective was reaffirmed in *Pierce* v. *Stablemen's Union,* 156 Cal. 70 [103 P. 324], even though the picketing in that case was enjoined because it involved force and violence.

The precise issue of this case was raised and decided in *C. S. Smith Met. Market Co.* v. *Lyons,* 16 Cal.2d 389 [106 P.2d 414], a suit to restrain a union from picketing and boycotting a food market to organize the nonunion butchers and to obtain a closed shop agreement. No labor dispute existed between the employer and the butchers in that case and none of them wished to join the picketing union.　▇▇▇　The court held that the concerted activity was proper because "[t]he members of a labor organization may have a substantial interest in the employment relations of an employer although none of them is or ever has been employed by him. The reason for this is that the employment relations of every employer affect the working conditions and bargaining power of employees throughout the industry in which he competes. Hence, where union and nonunion employees are engaged in a similar occupation and their respective employers are engaged in trade competition one with another, the efforts of the union to extend its membership to the employments in which it has no foothold is not an unreasonable aim." (*Id.,* at 401.)

In *McKay* v. *Retail Automobile S. L. Union No. 1067,* 16 Cal.2d 311 [106 P.2d 373], this court held that a labor union that represented none of an employer's salesmen could lawfully engage in concerted activity to obtain a closed shop agreement since that objective had a reasonable relation to the betterment of the conditions of labor. Substantially the same conclusion was reached in *Lund* v. *Auto Mechanics Union No. 1414,* 16 Cal.2d 374, 378 [106 P.2d 408].

In *Shafer* v. *Registered Pharmacists Union,* 16 Cal.2d 379 [106 P.2d 403], involving a strike by plaintiff's union pharmacists to obtain a closed shop agreement, the propriety of the closed shop as a labor objective under common-law principles was conceded and the crucial question was whether sections 920, 921, and 923 of the Labor Code outlawed closed shop agreements. Recognizing that these sections were enacted to outlaw yellow-dog contracts, the court held that they "lay no statutory restraints upon the workers' efforts to secure a closed shop contract from an employer. . . ." (*Id.,* at 388.)

In *Sontag Chain Stores Co.* v. *Superior Court,* 18 Cal.2d 92 [113 P.2d 689], the court followed its earlier decisions by holding that the superior court had exceeded its jurisdiction in permanently restraining a union from peacefully picketing to obtain a union shop agreement.　▇▇▇　The principle that a union may use economic pressure to achieve a closed or union

shop agreement even though the employees in the picketed shop do not belong to the union and have no dispute with their employer, established in the foregoing cases, has been restated in many cases not directly concerned with the point. (*Magill Bros.* v. *Building Service etc. Union*, 20 Cal.2d 506, 508 [127 P.2d 542]; *James* v. *Marinship Corp.*, 25 Cal.2d 721, 730 [155 P.2d 329, 160 A.L.R. 900]; *Park & T. I. Corp.* v. *International elc. of Teamsters*, 27 Cal.2d 599, 604 [165 P.2d 891, 162 A.L.R. 1426] and cases cited; *DeMille* v. *American Fed. of Radio Artists*, 31 Cal.2d 139, 144-145 [187 P.2d 769, 175 A.L.R. 382]; *Charles H. Benton, Inc.* v. *Painters Union*, 45 Cal.2d 677, 683 [291 P.2d 13]; see *Fortenbury* v. *Superior Court*, 16 Cal.2d 405, 409 [106 P.2d 411]; *Williams* v. *International elc. of Boilermakers*, 27 Cal.2d 586 [165 P.2d 903]; *Thompson* v. *Moore Drydock Co.*, 27 Cal.2d 595 [165 P.2d 901].)

Thus, for 50 years, until the four-to-three decision of this court in *Garmon* v. *San Diego Building Trades Council*, 49 Cal.2d 595 [320 P.2d 473], in 1958, it was the settled law of this state that union labor could freely compete for jobs in the labor market and seek to improve wages and working conditions by engaging in lawful concerted activities such as strikes and picketing. The law moreover recognized that union labor has a legitimate interest in organizing workmen in competing nonunion shops to insure the benefits of collective bargaining in union shops. Concerted activities such as picketing to achieve that goal were legitimate even when the employees in the nonunion shops did not wish to join or to be represented by the union. Just as the union had to reckon with the risk that it might lose its struggle for organization, so the nonunion employer risked loss of business, and hence his employees risked loss of employment, in resisting organization.

Such risks, grim as they are, are the price of lawful competition in a free enterprise system. The union plays for the high stakes of holding the gains it has made in union shops. The nonunion shop plays for the high stakes of holding the competitive advantages it has against union shops. The nonunion workers must then decide between alternatives neither of which is of their own choosing. They may welcome organization or merely accede to it as the lesser of two evils. On the other hand they may dislike organization, or merely regard it as a lost cause, or resist it out of fear of losing what they presently hold or out of hope that they will emerge as free-

riding beneficiaries of organizations which their fellows will join and support.

In the absence of statutory regulation the struggle can be bitterly hard on all sides. ██ The hardship does not render less legitimate the objectives of the union in seeking organization or the objectives of the nonunion shop in resisting it, or the objectives of the nonunion workers who may either join or resist. Confronted with the legitimate objectives of all parties concerned in such a struggle, it is not for the courts to abate it, however keenly aware they may be of its inevitable hardships. They are bound to remain aware also that they cannot properly encroach upon the function of regulation that belongs to the Legislature.

In *Chavez* v. *Sargent,* 52 Cal.2d 162 [339 P.2d 801], however, a majority of this court ignored the traditional doctrine of separation of powers to write a state law of labor relations based on the Taft-Hartley Act. That case suggested that many of the earlier cases had been superseded by the subsequent enactment of the Jurisdictional Strike Act (Lab. Code, §§ 1115-1120, 1122). That conclusion was reached by interpreting section 1117, which defines a labor organization as "any organization or any agency or employee representation committee or any local unit thereof in which employees participate, and exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, hours of employment or conditions of work, which labor organization is not found to be or to have been financed in whole or in part, interfered with, dominated or controlled by the employer or any employer association within one year of the commencement of any proceeding brought under this chapter . . ." to apply to a group of unorganized, nonunion employees who are satisfied with their terms and conditions of employment and therefore do not wish to engage in collective bargaining. (*Chavez* v. *Sargent, supra,* at 197-203.) The controversy between this unorganized group and a national labor organization as to whether the former shall join the union was then converted into a jurisdictional strike, defined by section 1118 as "a concerted refusal to perform work for an employer or any other concerted interference with an employer's operation or business, arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to bargain collectively with an employer on behalf of his employees or any of them . . . [or] to

have its members perform work for an employer'' so as to make the act applicable to the fact situations of the McKay, Shafer, Lyons and Fortenbury cases, *supra*.

Even under the *Chavez* interpretation of the act, however, its terms cannot possibly apply to the *Shafer* and *Fortenbury* situations. In *Shafer*, all of plaintiff's 14 pharmacists and assistant pharmacists who were eligible for membership were union members and all but one wanted the closed shop agreement. In *Fortenbury*, the strike was conducted by employees of the shop as well as other union members. There was no question in either case of a dispute between rival labor organizations; the only dispute was between the employees and the employer. ▮▮▮ The Shafer case therefore established that sections 920, 921, and 923 of the Labor Code do not affect the propriety of closed or union shop agreements and concerted activities to obtain such agreements. (See *Park & T. I. Corp.* v. *International etc. of Teamsters*, 27 Cal.2d 599, 609-613 [165 P.2d 891, 162 A.L.R. 1426].)

There is some reason, however, for the suggestion that the McKay case, *supra*, has been superseded by the act because the employees in that case had formed an inside union. The court held, however, that the employees had failed to sustain the burden of proving that their organization was a ''*bona fide* independent labor union.'' (*Id.*, at 329-330.) Whether the act has superseded that case on its facts therefore depends on whether the employee group was financed, interfered with, dominated or controlled by the employer. (Lab. Code, § 1117.)

The act did not supersede the Lyons case, *supra*, however. ▮▮▮ Under sections 1117 and 1118 of the Labor Code a labor organization is not formed merely by an agreement of employees not to be organized. A group whose sole purpose is to express the wish of its members not to deal as a group with the employer ''concerning grievances, labor disputes, wages, hours of employment or conditions of work'' is not an organization that exists for the purposes of section 1117, for it lacks the purpose ''of dealing with employers concerning grievances, labor disputes, wages, hours of employment or conditions of work.'' (Lab. Code, § 1117.) Moreover, even if such a group could be a labor organization under section 1117, its objection to organization of the shop could not give rise to a jurisdictional strike within the meaning of section 1118. ▮▮▮ Such a strike can only arise out of a ''controversy

between two or more labor organizations as to which of them has or should have the exclusive right to bargain collectively with an employer . . . [or] to have its members perform work for an employer.'' (Lab. Code, § 1118.) The wish of all or some of the employees to work in an open shop without collective bargaining is the very antithesis of a demand for the ''exclusive right to have [their] members perform work for [the] employer.''

In 1960, in *Petri Cleaners, Inc.* v. *Automotive Employees, etc. Local No. 88, ante,* p. 455 [2 Cal.Rptr. 470, 349 P.2d 76], the court disapproved the sweeping pronouncement of the Chavez case and retraced its steps to the *stare decisis* of half a century, reaffirming the cumulative decisions from 1908 to 1958.

When it made that reaffirmation the court was mindful that no decision was possible that would not entail some hardship. Nevertheless it felt bound to respect the traditional principle of separation of powers that gives to the Legislature the responsibility of making any major changes in social and economic policy. It made clear that the court would not establish by judicial legislation a little Taft-Hartley Act for California that only the Legislature can properly consider and enact. The Legislature is uniquely able to amass economic data and hold hearings where it can give heed to many representatives of the public besides parties to a controversy. It can best determine whether there should be further governmental regulation of peaceful competitive economic activity.

 The Legislature has so far acted not only to outlaw the employer's use of the yellow-dog contract (Lab. Code, §§ 920-922) but also labor's use of the jurisdictional strike (Lab. Code, §§ 1115-1122.) With the exception of these practices the present legislative policy favors free competition for jobs by lawful peaceful means. Additional restrictions such as those contained in ''right-to-work'' laws or little Taft-Hartley acts have been defeated by the people or the Legislature,[1] although they are always open to reconsideration.

---

[1]The California policy of course differs from policies of states with different statutory provisions. Twenty states have ''right-to-work'' laws that prohibit union security contracts. (See dissenting opinion herein, footnote 7.) Ten other states have statutes specifically requiring that union security contracts be supported by a majority vote of the employees directly involved. These states, all except Hawaii cited in footnote 4 of the dissenting opinion herein, include Colorado (Rev. Stats. § 80-5-6 (c), requiring approval of three-quarters); Connecticut (Gen.

The Petri case reaffirmed the traditional separation of powers that compels the judiciary to keep its distance from major formulations of policy.

This court's interpretation of section 923 of the Labor Code (*Shafer* v. *Registered Pharmacists Union, supra*) is in accord with the United States Supreme Court's interpretation of a similar provision of the Taft-Hartley Act. (§ 7, 29 U.S.C. § 157.) Pointing out that "[b]asic to the right guaranteed to employees in § 7 to form, join or assist labor organizations, is the right to engage in concerted activities to persuade other employees to join for their mutual aid and protection" the United States Supreme Court, after a review of the legislative materials, held that peaceful picketing for recognition by a union that does not represent a majority of the employees is not an unfair labor practice under § 8(b)(1)(A). (*N.L.R.B.* v. *Drivers' Local 639*, 362 U.S. 274 [80 S.Ct. 706, 4 L.Ed.2d 710]; 28 U.S.L. Week 4217, 4219, 4222, March 28, 1960.) The court's opinion makes plain that the Labor-Management Reporting and Disclosure Act of 1959 does not ". . . relegate this litigation to the status of an unimportant controversy over the meaning of a statute which has been significantly changed." (*Id.*, at 4218.)

Since the judgment must be reversed, we deem it appropriate to settle several questions of law that may arise on

Stats. § 31-105 (5), 31-106(a)); Hawaii (1959 Session Laws, Act. 210, p. 141); Idaho (Code, § 44-107, 1959 Supp.); Kansas (Gen. Stat. § 44-809 (4), also included in the 20 states with "right-to-work" laws and not counted in these ten); Massachusetts (Ann. Laws, ch. 150A, §§ 4(3) and 5); Michigan (Stat. Ann. § 17. 454 (15)); Minnesota (Stat. Ann. §§ 179.12 (3), 179.16 (1); New York (Laws Ann. ch. 31, §§ 704 (5) 705); Pennsylvania (Stats. Ann. tit. 43, §§ 211.6 (1) (c), 211.7 (a)); and Wisconsin (Stat. Ann. § 111.06 (1) (c)). Six states not otherwise accounted for and having only a provision more or less similar to section 923 of the California Labor Code reach a result contrary to that of *Shafer* v. *Registered Pharmacists Union, supra*. (Kentucky, Maine, Missouri, New Jersey, Washington and Wyoming. See cases cited in footnote 4 of the dissenting opinion herein.) Of the remaining thirteen states, six have no specific statutes and of these three (New Mexico, Rhode Island, and West Virginia) support the majority view in this case while three (Ohio, Illinois, and perhaps New Hampshire) support the dissent's view. (See footnotes 6 and 8 of dissenting opinion herein. The New Hampshire case is unclear as to whether the union had majority support. That it had some support from the employees is clear. [*White Mt. Freezer Co.* v. *Murphy*] 78 N.H. 398 [101 A. 357, 358].) Of the remaining seven states, six apparently have not passed on the point (Alaska, Delaware, Maryland, Oklahoma, Vermont and Montana); and one (Oregon) has repealed its labor relations statute and not yet enacted another (Ore. Laws, 1959, ch. 55, § 1). Thus, nine states without special statutes are opposed to the California position.

remand. (Code Civ. Proc., § 53.) The picketing in this case was for a dual purpose: to achieve a union shop agreement and to compel plaintiff, as a barber working with the tools of the trade, to join the union. Despite the parties' contrary assumption, it is not clear whether the trial court enjoined picketing for the latter purpose. The judgment reads in part "[t]hat the defendants and each of them be and they hereby are enjoined from picketing the plaintiff's place of business . . . in order to compel the plaintiff to execute the form of agreement demanded by them or any other form of agreement, requiring the plaintiff to compel his employees to join the Defendant Union against the will of the said employees."

After defendants' national union amended its constitution to require that all barbers who work with the tools of the trade become members of a local union or an employers' guild, the courts of many states were called upon to determine whether a businessman-worker could properly be required to join a workman's union. Since many of the barber shops involved in these test cases had operated as union shops before the amendment, several of the cases took the form of actions by the union to recover its union shop card or by the employer-barber to retain the card. Some of the cases, therefore, hold only that the union may recover the card as an article of property and do not decide whether the employer-barber may be required to join the union. (*Head* v. *Local Union No. 83, Journeymen Barbers,* 262 Ala. 84, 87-89 [77 So.2d 363] ; *Rainwater* v. *Trimble,* 207 Ga. 306, 307-308 [61 S.E.2d 420] ; *Journeymen Barbers, Hairdressers, etc., Local 687* v. *Pollino,* 22 N.J. 389, 398-401 [126 A.2d 194] ; *Foutts* v. *Journeymen Barbers,* 155 Ohio St. 573, 577-581 [99 N.E.2d 782] ; *cf. Wisconsin Employ. Rel. Board* v. *Journeymen Barbers,* 272 Wis. 84, 90-94 [74 N.W.2d 815].) One case holds that the payment of union dues and fees by an employer constitutes the contribution of financial support to the union in violation of state statutes. (*Journeymen Barbers etc., Local Union No. 205* v. *Industrial Comm.,* 128 Colo. 121, 131-132 [260 P.2d 941].) A third group of cases decides on the merits either that a union may properly require that a businessman-worker who competes with union labor join the union (*Coons* v. *Journeymen Barbers,* 222 Minn. 100, 102-105 [23 N.W.2d 345] ; *Romero* v. *Journeymen Barbers,* 63 N.M. 443, 444-447 [321 P.2d 628]) or that it may not do so (*Kerkemeyer* v. *Midkiff,* —— Mo. —— [299 S.W.2d 409, 417] ; *Grimaldi* v. *Local No. 9,*

*Journeymen Barbers,* 397 Pa. 1 [153 A.2d 214, 215], cert. den., 361 U.S. 901 [80 S.Ct. 210, 4 L.Ed.2d 157].)

The law of California is that if plaintiff was offered the same rights of union membership as the employee members (*Riviello* v. *Journeymen Barbers etc. Union,* 88 Cal.App.2d 499, 504-507 [199 P.2d 400]; second opinion, 109 Cal.App.2d 123, 124, 129 [240 P.2d 361]), defendants' peaceful picketing to compel him to join the union was proper because "[t]he businessman-worker operating in an industry or field in which he competes with organized workmen may likewise be subjected to the same means of persuasion as any other workman to join the union and conform to the conditions regulating union labor." (*Bautista* v. *Jones,* 25 Cal.2d 746, 749 [155 P.2d 343]; see *Emde* v. *San Joaquin County etc. Council,* 23 Cal.2d 146, 155 [143 P.2d 20, 150 A.L.R. 916].) *Safeway Stores* v. *Retail Clerks etc. Assn.,* 41 Cal.2d 567 [261 P.2d 721], is not to the contrary. That case holds that organized labor may not, consistently with public policy, require store managers who are agents of management to divide their loyalties by becoming union members. (*Id.,* at 575.) Plaintiff owes no loyalty to any principal and thus will not be placed in the same position as the store managers by becoming a union member. Moreover, the store managers did not normally perform the same duties as the store clerks in the Safeway case (*Id.,* at 572) and thus did not compete directly with the union members. Plaintiff, by choosing to compete on the same level as union barbers, threatens the union-won scale of terms and conditions, even if he voluntarily adheres to the same or a higher scale (see *C. S. Smith Met. Market Co.* v. *Lyons,* 16 Cal.2d 389, 401 [106 P.2d 414]).

Plaintiff contends that since employer-barbers and proprietor-barbers are members of the union, defendant union is not merely a labor organization but also a price-fixing organization of employers. The union contract, offered to plaintiff in this case, sets the weekly wage of a full-time journeyman barber at 70 per cent of his gross receipts with a guaranteed minimum of $50 per week. Clause 13 provides that "[w]hereas wages are paid on a percentage basis the prices to be charged under this Agreement in all Union barber shops not to be less than the following: [listing the prices for barber shop services]."

Combinations entered into for the purpose of restraining competition and fixing prices are unlawful in this

state under the common law (*Speegle* v. *Board of Fire Underwriters,* 29 Cal.2d 34, 44 [172 P.2d 867]) and the Cartwright Act. (Bus. & Prof. Code, § 16700 et seq.) ▮ Although human labor is not a "commodity" under the act (§ 16703), a service consisting in the main of human labor is. (*People* v. *Building Maintenance etc. Assn.,* 41 Cal.2d 719, 723 [264 P.2d 31].) ▮ Section 16703, however, is not limited to exempting from the act agreements that set the price of labor. "Reasonably interpreted, [it] must be held to have been intended to except from the operation of the act combinations of laborers for the purposes of furthering their interests by collective bargaining, when not otherwise unlawful." (*Schweizer* v. *Local Joint Executive Board,* 121 Cal.App.2d 45, 53 [262 P.2d 568].) Accordingly, "the real test in a particular case is the primary purpose of the agreement or combination in question." (*Schweizer* v. *Local Joint Executive Board, supra,* at 53.) ▮ Thus, a labor union, acting alone, violates the Cartwright Act only when its primary purpose is to accomplish a restraint of trade (*Alpha Beta Food Mkts.* v. *Amalgamated Meat Cutters,* 147 Cal.App.2d 343, 345-346 [305 P.2d 163]; *Kold Kist* v. *Amalgamated Meat Cutters,* 99 Cal.App.2d 191, 198-199 [221 P.2d 724]; cf. *O'Shea* v. *Tile Layers Union,* 155 Cal.App.2d 373, 376-377 [318 P.2d 102]; *Miracle Adhesives Corp.* v. *Peninsula Tile Contr. Assn.,* 157 Cal.App.2d 591, 594-595 [321 P.2d 482]; see also *Saveall* v. *Demers,* 322 Mass. 70, 72-73 [76 N.E.2d 12]; *Commonwealth* v. *McHugh,* 326 Mass. 249, 263-264 [93 N.E.2d 751]; *Purcell* v. *Journeymen Barbers,* 234 Mo.App. 843, 860 [133 S.W.2d 662]; but see *Cleaners, Dyers, etc. Union* v. *G.H.W. Cleaners & D.,* 200 La. 83, 90-91 [7 So.2d 623]), not when its purpose is to obtain a valid labor objective (*Los Angeles Pie Bakers Assn.* v. *Bakery Drivers,* 122 Cal.App.2d 237, 238, 243 [264 P.2d 615]; *Schweizer* v. *Local Joint Board, supra*; *Local 24, Internat'l Broth. Teamsters* v. *Oliver,* 358 U.S. 283, 292-295 [79 S.Ct. 297, 3 L.Ed.2d 312]). ▮ As in the rent-fixing clause considered in *Local 24, Internat'l Broth. Teamsters* v. *Oliver, supra,* the point of clause 13 is not price-fixing, but wage-fixing, and the presence of employer-barbers in the union does not convert the contract into an agreement between labor groups and nonlabor groups for the purpose of restraining trade. (Cf. *Alfred M. Lewis, Inc.* v. *Warehousemen etc. Local No. 542,* 163 Cal.App.2d 771 [330 P.2d 53]; *Allen Bradley Co.* v. *Local Union No. 3,* 325 U.S. 797 [65 S.Ct. 1533, 89 L.Ed.

1939] ; *Giboney* v. *Empire Storage Co.*, 336 U.S. 490 [69 S.Ct. 684, 93 L.Ed. 834].)

The conclusion we reach is not inconsistent with *Overland Pub. Co.* v. *H. S. Crocker Co.*, 193 Cal. 109 [222 P. 812]. In holding the agreement there involved between labor and nonlabor groups a violation of the Cartwright Act, this court said "[t]here is no question in our minds but that the primary purpose of this agreement was to create or carry out restrictions in trade or commerce. . . . ." (*Id.*, at 115.) There is not a shred of evidence in the record in the present case to support a contention that such was the purpose of clause 13.

Nor is our conclusion inconsistent with the general statement in *Speegle* v. *Board of Fire Underwriters*, 29 Cal.2d 34, 44-45 [172 P.2d 867], that "[t]he public interest requires free competition so that prices will not be dependent upon an understanding among suppliers of any given commodity, but upon the interplay of the economic forces of supply and demand." That statement cannot be wrenched from its context to condemn activity that the case did not contemplate. In the area of trade regulation the values of free competition themselves compete with the values of wage security. Clause 13 sought to secure certain wages as in any other union contract. The difficulty of setting a fixed wage that is fair and reasonable in a trade consisting entirely of personal services is apparent. The union's method of setting the cost of its labor to the employer in the barber's trade by reference to price is appropriate in a service trade as it might not be in areas where the worker's labor is not so predominantly linked with costs.

Respondent does not contend that the contract, if entered into between the union and an employer who does not work with the tools of the trade and hence does not belong to the union, is a violation of the common-law rule against price-fixing. He contends only that the union itself is a price-fixing association because some employers belong to it who have agreed among themselves to support minimum prices. As noted earlier, however, the employer-barbers are required to join the union only because they work in direct competition with employee-barbers and could affect the wage scale adversely if they were not subjected to union responsibilities, even if their individually established price scales were above the union scale. (See *C. S. Smith Met. Market Co.* v. *Lyons*, 16 Cal.2d 389, 401 [106 P.2d 414].)

Plaintiff also contends that because employer-members are required to pay union dues and fees, defendant is an employee group financed in part by employers in violation of section 1122 of the Labor Code. That section provides: "[a]ny person who organizes an employee group which is financed in whole or in part, interfered with or dominated or controlled by the employer or any employer association, as well as such employer or employer association, shall be liable to suit by any person who is injured thereby. Said injured party shall recover the damages sustained by him and the costs of suit." Section 1122 is part of the Jurisdictional Strike Act (Lab. Code, §§ 1115-1120, 1122) and its plain purpose is to give an action for damages to any person injured by the formation of a company union. Even were defendant partly financed by the dues of employer-members, their dues would not give them control over union power and policy. Employers are prohibited from financing labor unions because such financing might render a union less independent and thus less able to represent its members effectively vis-a-vis the employer. When, as here, the employer is himself a workman, his dues are no different from those of any other member. Plaintiff's reliance on *Journeymen Barbers, etc. Local Union No. 205* v. *Industrial Com.*, 128 Colo. 121, 131-132 [260 P.2d 941], which reached a different result under a statute making the employer's contribution of financial support to a labor union an unfair labor practice (Colo. Rev. Stat. 80-5-6(1)(b)), is misplaced. That case relied exclusively upon two earlier cases (*Wisconsin Employ. Rel. Board* v. *Journeymen Barbers,* 256 Wis. 77, 85-86 [39 N.W.2d 725]; *DiLeo* v. *Daneault,* 329 Mass. 590, 595-597 [109 N.E.2d 824]) that have been superseded by subsequent legislation (Wis. Stat. Ann. § 111.06 (1-b) (1957); see *Wisconsin Employ. Rel. Board* v. *Journeymen Barbers,* 272 Wis. 84, 89-90 [74 N.W.2d 815]; Ann. Laws of Mass. ch. 150A, § 4(2) (1956)).

In view of our conclusion that the trial court's judgment must be reversed, we need not consider defendants' contention that even if their picketing was directed toward an improper purpose the trial court lacked power to issue an injunction in the absence of proof that plaintiff had been injured by their conduct.

The judgment is reversed.

Gibson, C. J., Peters, J., and White, J., concurred.

SCHAUER, J., Dissenting.—The majority today present the second installment of the ambitious project undertaken by them in *Petri Cleaners, Inc.*, v. *Automotive Employees, etc., Local No. 88* (1960), *ante,* p. 455 [2 Cal.Rptr. 470, 349 P.2d 76]. "The crucial issue in this case," say the majority (*ante,* p. 877), "is whether a closed or union shop agreement is a proper objective of a labor union that does not represent any of the employees directly involved." This brief declaration appears, on further reading of the opinion, to be somewhat of an oversimplification of the problems involved.

A more revealing definition of the "crucial issue" would be: Is picketing by an unwanted union which represents none, or less than a majority, of the employes in the picketed shop, lawful when the objective of the picketing is to coerce the employer to himself join the union and in turn to coerce his employes to join it?

Another "crucial issue," undefined by the majority but actually disposed of by them, is: Shall this court refuse to apply the Cartwright Act[1] to price-fixing agreements among employers, and among employers and unions, in cases wherein the otherwise illegal agreement is demanded by a labor union in order to prevent the proprietors of either partially or exclusively self-owned and serviced barber shops from competing on a price basis either among themselves or with any union shops? An ancillary question is: Shall this court, without statutory authorization, differentiate between the types of business activity in which it will give effect to the Cartwright Act? The holdings of the majority on these, and on even more fundamental, issues and my reasons for disagreement are hereinafter stated.

At the outset I wish to make it altogether clear that the grounds on which I challenge the majority do not involve any pro-labor or anti-labor factionalism. *Chavez* v. *Sargent* (1959), 52 Cal.2d 162 [339 P.2d 801]—which in this case as well as in Petri is the principal target for the majority's attack—was not an anti-organized labor decision. It did not overrule a single previous decision of this court. It did not strike down or refuse to enforce any statute of California. A reading of the majority opinion in the Chavez case will demonstrate that

---

[1]Stats. 1907, ch. 530, p. 984 et seq., amended Stats. 1909, ch. 362, p. 593 et seq.; see also, for codification of statutes proscribing or regulating contracts in restraint of trade, Bus. & Prof. Code, § 16600 et seq., and combinations in restraint of trade, Bus. & Prof. Code, § 16700 et seq. (Stats. 1941, ch. 526, p. 1834 et seq.).

it staunchly defends the statutory proscription of yellow dog contracts, that it faithfully upholds the statutorily defined rights of workmen to self-organization and to collective bargaining and to union security contracts; likewise it sustains the use of labor's classic weapons—the strike and peaceful picketing—for all lawful objectives. The quarrel with my associates is on a more fundamental basis. It is on four basic points:

1. The new majority have refused reasonable respect for the doctrine of *stare decisis*. (See *Petri Cleaners, Inc.* v. *Automotive Employees, etc., Local No. 88* (1960), *supra, ante,* pp. 455, 475.)

2. They have refused to abide by the elementary principle that reviewing courts will not find facts contrary to those found by the trial court on substantially conflicting evidence. (See Petri dissent, *ante,* pp. 475, 486-491, where the evidence in that case relative to the issue of the Association of Petri employees as an independent or a company union is carefully reviewed and shown to be sufficient to support the trial court's implied findings. It may also be noted that the three justices of the District Court of Appeal who had previously reviewed the trial court's decision (1959, Cal.App.), 340 P.2d 731, as well as three justices of this court recognized the substantiality and sufficiency of the evidence upon which the trial judge acted.)[2]

[2]Familiar rules for the guidance of a reviewing court in passing upon the question whether the evidence supports the determination of the trier of fact that the situation presented to him does or does not constitute a law-defined operative fact (e.g., in Petri, the employer's interference with a union; in the next quoted opinion, an injury ''arising out of and in the course of employment'') are stated in *Cardillo* v. *Liberty Mutual Ins. Co.* (1947), 330 U.S. 469, 477-478 [67 S.Ct. 801, 806-807, 91 L.Ed. 1028], as follows: ''In determining [whether the legally operative ultimate fact existed, the trier of fact] . . . must necessarily draw an inference from what he has found to be the basic facts. . . . If supported by evidence and not inconsistent with the law, the . . . inference [of the operative fact by the finder] . . . is conclusive. No reviewing court can then set aside that inference because the opposite one is thought to be more reasonable; nor can the opposite inference be substituted by the court because of a belief that the one chosen by the [finder] . . . is factually questionable. [Citations.]

''It matters not that the basic facts from which the [finder] . . . draws this inference are undisputed rather than controverted. [Citation.] It is likewise immaterial that the facts permit the drawing of diverse inferences. The [trier of fact] . . . alone is charged with the duty of initially selecting the inference which seems most reasonable and his choice, if otherwise sustainable, may not be disturbed by a reviewing court. [Citation.] Moreover, the fact that the inference . . . involves an application of a broad statutory term or phrase to a specific set of facts

3. The new majority have refused to uphold and apply the plain language of our basic labor relations statutes (Lab. Code, § 923, and related sections, all quoted and upheld in *Chavez* v. *Sargent, supra,* pp. 179-182, 186, 190, 201-203 of 52 Cal.2d). Since section 923 is unambiguous, is not unconstitutional, and has not been repealed, California is faced with a peculiar conflict of laws: On one hand, the above cited statute and implementing decisions; on the other hand, the Petri case and today's decision. Such conflict, active or potential, and productive of litigation, is likely to be a continuing one unless and until the majority yield to the statutes or the latter are amended to conform to the views of the majority.

4. In today's case the majority refuse to apply the Cartwright Act. To reach the result announced they disregard, without expressly disavowing, the principle declared by the same author in *Speegle* v. *Board of Fire Underwriters* (1946), 29 Cal.2d 34, 44 [172 P.2d 867], that "The public interest requires free competition so that prices be not dependent upon an understanding among suppliers of any given commodity but upon the interplay of the economic forces of supply and demand."

The actions of the majority in Petri as to points 1, 2 and 3 above enumerated, have been disturbing to me as a lawyer and judge. Their action today, regrettably and regardless of the fact, appears to lend further credence to the fears of eminent counsel implicit in the following excerpt from their respectfully and earnestly urged petition for reconsideration by this court of its decision in Petri: "The overturning of *Chavez* and *Retail Clerks* by the present majority, within a few months after those cases were decided, has created confusion not only within the legal profession but also in labor-management relations and among the public generally. The disposition of those cases so soon after they were decided [less than nine months] raises a serious question as to whether in California we are a government of men rather than of laws."

gives rise to no greater scope of judicial review. [Citations.] Even if such an inference be considered more legal than factual in nature, the reviewing court's function is exhausted when it becomes evident that the [finder's] . . . choice has substantial roots in the evidence and is not forbidden by the law."

The foregoing rules are normally recognized and followed by this court as well as the high federal court. (*Hamilton* v. *Pacific Elec. Ry. Co.* (1939), 12 Cal.2d 598, 602 [5] [86 P.2d 829].)

A comment in 47 Cal.L.Rev. 905, 916, which concerned
Garmon, Chavez, and Retail Clerks' Union and which was
prepared before the Petri decision, predicted that "In a field
as controversial as labor relations, future developments are
apt to be dependent on political fortunes and changes in the
personnel of the courts"; less accurate was its prediction that
"It would seem, however, that at least the holdings of *Chavez*
and *Retails Clerks' Union* will stand."[3]

Further grave, constructive and merited criticism of the
action of the court in Petri appears in the brief of amici
curiae in support of respondent's request for a reconsidera-
tion of that decision: "The consequences of the dicta in the
Court's opinion as to Section 923 and *Garmon* are serious
and far-reaching. At a time when national policy banning
stranger picketing has been recently affirmed and strengthened,
the Court's opinion sets California's small enterprises on a
different path. The opinion condones what has cynically been
termed 'vertical organizing', and does so despite the plain
words of a plain statute. We believe that such a result should
not be reached at all, but particularly should not be reached
in a case wherein the issue is not squarely presented for
decision."

Professor Bernard D. Meltzer of the University of Chicago
Law School has pertinently said (*Recognition-Organizational*

---

[3]The fact that the Petri opinion was filed less than nine months after
Chavez brings to mind the protests of Mr. Justice Roberts in *Mahnich* v.
*Southern S. S. Co.* (1944), 321 U.S. 96, 112-113 [64 S.Ct. 455, 88 L.Ed.
561]: "The evil resulting from overruling earlier considered decisions
must be evident. In the present case, the court below naturally felt
bound to follow and apply the law as clearly announced by this court.
If litigants and lower federal courts are not to do so, the law becomes
not a chart to govern conduct but a game of chance; instead of settling
rights and liabilities it unsettles them. Counsel and parties will bring
and prosecute actions in the teeth of the decisions that such actions are
not maintainable on the not improbable chance that the asserted rule will
be thrown overboard. Defendants will not know whether to litigate or to
settle for they will have no assurance that a declared rule will be fol-
lowed. But the more deplorable consequence will inevitably be that the
administration of justice will fall into disrepute." And again in *Smith
v. Allwright* (1944), 321 U.S. 649, 666, 669 [64 S.Ct. 757, 88 L.Ed. 987,
151 A.L.R. 1110]: The "policy of the court freely to disregard and to
overrule considered decisions . . . indicates an intolerance for what those
who have composed this court in the past have conscientiously and delib-
erately concluded, and involves an assumption that knowledge and wisdom
reside in us which was denied to our predecessors. . . .

"The reason for my concern is that the instant decision, overruling
that announced about nine years ago, tends to bring adjudications of this
tribunal into the same class as a restricted railroad ticket, good for this
day and train only."

*Picketing and Right-to-Work Laws* (1958), 9 Labor Law Journ. 55, 58), concerning the Taft-Hartley (pre-1959) Act, "Although the statutory scheme involves a limitation on the freedom of a dissenting minority, this limitation seems justifiable on two grounds: First, it is necessary for orderly collective bargaining, which has important values. Secondly, the requirement that the bargaining agent have the support of the uncoerced majority makes his authority consistent with the generally accepted principles that the government of political or private groups should depend on the consent by a majority of those governed.

"There are those who would repudiate the requirement of majority support on the ground that a union, at least if it represents a substantial segment of an industry, is automatically entitled to the worker's allegiance and support. I find this argument unacceptable for several reasons: First it ignores the fact that the value of collective bargaining both to the enterprise and to the employees depends on consent, by the employees affected, to the bargaining agent's role and to the agreement he has negotiated. Majority support, although it is not sufficient, is generally necessary, for such consent. For the purpose of determining the existence of such support, the 'industry' is an abstraction far removed from the employee's interest, which is generally centered in the plant or the enterprise which employs him. Accordingly, the plant or the enterprise and not the industry appears in general to be the largest unit which can be appropriately used in determining whether the necessary majority support exists. Secondly, the use of the smallest possible unit, consistent with orderly and stable collective bargaining, will minimize the need for subordinating the preferences of large and concentrated minorities to the requirements of majority rule. Minimizing the coercion of such minorities is still an important value in our society, despite the expansion of institutional arrangements which promote the subordination of the interests of individuals and minorities to those of larger groups. For these reasons, I believe that the architects of the federal policy were wise in rejecting the notion that unions, like the state, are entitled to any automatic allegiance. . . .

"It is, I believe, fair to assume that most unorganized employers want to stay that way. Furthermore, the inherent limitations of the law, as well as bad administration, permit some employers, by unlawful coercion, to deny to unions the

bargaining status which they would have otherwise achieved. But these considerations, troublesome as they are, do not warrant the indiscriminate use of coercive picketing against lawful as well as lawless employers and their employees.''

The more specific reasons for my disagreement with the holding of the majority that, consonant with California law, an ''outside'' labor union can properly put economic pressure on an employer to compel him to execute a closed or union shop agreement although none of his employes wish to join or be represented by the union, are stated in the majority opinions in *Garmon* v. *San Diego Bldg. Trades. Council* (1958), 49 Cal.2d 595 [320 P.2d 473]; *Chavez* v. *Sargent* (1959), *supra,* 52 Cal.2d 162; and *Retail Clerks' Union* v. *Superior Court* (1959), 52 Cal.2d 222 [339 P.2d 839]; and the dissenting opinion in *Petri Cleaners, Inc.* v. *Automotive Employees, etc. Local No. 88* (1960), *supra, ante,* pp. 455, 475. Section 923 of the Labor Code says that ''the individual workman . . . shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of . . . [collective bargaining] representatives or in self-organization . . .'' The majority in Petri and in this case, in effect, add to the quoted clear and explicit statutory language an exception or proviso which, in my opinion, is not only beyond the proper function of a court but which does not promote the interests of either individual workmen or of organized labor. It seems to me that, when all or a majority of the subject employes of a particular employer choose not to join a union, the spirit and language of section 923 are as much violated if the employer coerces them to do so because of the pressure of concerted union activity, such as peaceful picketing, as they would be if the employer acted at the mere suggestion of a single representative of the union, or upon his own initiative.

Because of the above noted conflict between the statutory law (Lab. Code, § 923, and related sections, as upheld and applied in the cases last hereinabove cited) and the decisional law declared in Petri and in this case, it has appeared desirable to comprehensively research the pertinent statutes and decisions of other jurisdictions to ascertain which view the weight of authority supports. The sources examined are listed in appropriately identified footnotes and the conclusions reached are stated in the text which follows.

The view that it is unlawful for union members to engage

in peaceful but coercive picketing of the premises of an employer whose employes do not wish to join the union, for the purpose of compelling the employer to agree to, and in his turn to then compel, a closed or union shop, is not, as some of amici curiae supporting the defendant barbers' union here suggest, a strange and shocking aberration. On the contrary, such is the view of most of the states today, and the view of our national government to some as yet unclearly defined extent (see *N.L.R.B.* v. *Drivers Union Local 639* (1960), 362 U.S. 274 [80 S.Ct. 706, 4 L.Ed.2d 710] [28 Law Week 4217]; National Labor Management Relations Act, as amended 1959, § 8(b)(7)); and in years recently past state courts (when they were not precluded on the facts of the particular case by federal preemption) often enjoined such picketing.

In a number of states it has been held that provisions of a state statute or constitution similar to section 923 of our Labor Code make the object of such picketing unlawful.[4]

---

[4]Alabama: The following cases consider title 26, Code, § 383 (''Every person shall be free to join or refrain from joining any labor organization . . . and in the exercise of such freedom shall be free from interference'') prior to Alabama's enactment of a ''right-to-work'' statute: A closed or union shop was a lawful object of picketing where the picketing union represented a majority of the employes (*Hotel & Restaurant Employees* v. *Greenwood* (1947), 249 Ala. 265 [30 So.2d 696, 703 [12], 705 [17]]), but picketing for such object by a minority union could be enjoined (*Klibanoff* v. *Tri-Cities Retail Cl. Union* (1953), 258 Ala. 479 [64 So.2d 393, 398]).

Colorado: *Amalgamated Meat Cutters* v. *Green* (1948), 119 Colo. 92 [200 P.2d 924, 930-931], affirming injunction of picketing to compel an employer to enter into an ''all-union contract'' after a majority of his employes had voted against union representation; by executing such a contract the employer would have committed the unfair labor practices of interfering with employes' right to organize or remain unorganized (§ 80-5-6(1)(a)) and encouraging or discouraging membership in a labor organization, except where the employer enters into an ''all-union'' agreement as authorized by the provisions (§ 80-5-6(1)(c)) of the comprehensive Labor Peace Act (Rev. Stats., ch. 80, art. 5, §§ 1-22, enacted in 1943). See also *Building Const. Tr. Council* v. *American Bldrs., Inc.* (1959), —— Colo. —— [337 P.2d 953, 955-956].

Connecticut: *Lavery's Main Street Grill* v. *Hotel & Restaurant Emp.* (1959), 146 Conn. 93 [147 A.2d 902, 905-906 [2-4]]; *Kenmike Theatre* v. *Moving Picture Operators* (1952), 139 Conn. 95 [90 A.2d 881, 882-883]. Connecticut has a comprehensive Labor Relations Act (Gen. Stats., 1949, §§ 7388-7399).

Idaho: *Poffenroth* v. *Culinary Workers Union* (1951), 71 Idaho 412 [232 P.2d 968, 969]; *J. J. Newberry Co.* v. *Retail Clerks International Ass'n* (1956), 78 Idaho 85 [298 P.2d 375, 379 [4]], reversed because of federal preemption, 352 U.S. 987. The Idaho Code contains provisions (§§ 44-701, 44-702) like sections 923 and 921 of our Labor Code, to-

Some of these states mentioned in footnote 4 do and some do not have more or less detailed labor relations acts and agencies to administer them; in any event, the courts of such states

---

gether with other provisions like those of the Norris-La Guardia Act which were omitted from our code.

Indiana (prior to enactment of a ''right-to-work'' law): *Roth* v. *Local Union No. 1400* (1939), 216 Ind. 363, 371 [24 N.E.2d 280, 282-283 [5, 6]], applying Acts 1933, ch. 12, § 2 (Burns' Ann. Stat., 1933, § 40-502), a declaration of policy like section 923 of our Labor Code, in the Indiana anti-injunction act.

Kansas (prior to 1958 ''right-to-work'' amendment to state Constitution): *Binder* v. *Construction etc. Union* (1957), 181 Kan. 799 [317 P.2d 371, 376-378 [2, 4]], applying G.S. 1949, § 44-803 (like section 923 of our Labor Code, and also stating the right of employes ''to refrain from . . . such activities''), G.S. 1955, § 44-808 (employer coercion of employes in the exercise of their rights under section 44-803 unlawful), G.S. 1955, § 44-809 (12) (such coercion of employes by ''any person'' unlawful).

Kentucky: *Blue Boar Cafeteria Co.* v. *Hotel & Restaurant Employees etc. Union* (1952), —— Ky. —— [254 S.W.2d 335, 338-339 [2]], cert. den. 346 U.S. 834 [74 S.Ct. 41, 98 L.Ed. 357]; *Hotel & Restaurant Employees etc. Union* v. *Lambert* (1953), —— (Ky.App.) —— 258 S.W.2d 694 [1], applying KRS 336.130 (Acts Gen. Assembly, 1940, ch. 105), which was rather like section 923 of our Labor Code.

Maine: *Pappas* v. *Stacey* (1955), 151 Me. 36 [116 A.2d 497, 499-501 [3]], appeal dismissed, 350 U.S. 870 [76 S.Ct. 117, 100 L.Ed. 770], applying P.L. 1941, ch. 292 (R.S., ch. 30, § 15), like California Labor Code, section 923.

Massachusetts: Ann. Laws, ch. 150A, is a comprehensive Labor Relations Act. The employer's compliance with a closed shop agreement between the employer and one not certified as the representative of his employes pursuant to the act would be an unfair labor practice and picketing to enforce such compliance can be enjoined. (*R. H. White Co.* v. *Murphy* (1942), 310 Mass. 510 [38 N.E.2d 685, 690 [9, 10], 691].) Apart from the act closed shop agreements voluntarily made have ''always'' been recognized and enforced. But a strike for a closed shop ''is for an unlawful labor objective'' and peaceful picketing for such purpose can be enjoined. (*Fashioncraft, Inc.* v. *Halpern* (1943), 313 Mass. 385 [48 N.E.2d 1, 3-4, 5].)

Michigan: *Way Baking Co.* v. *Teamsters & Truck Drivers* (1953), 335 Mich. 478 [56 N.W.2d 357, 362 [4, 5]], cert. den. 345 U.S. 957 [73 S.Ct. 939, 97 L.Ed. 1378], applying Stats. Ann., § 17.454(18) (C.L. 1948, § 423.17, as amended by P.A. 1949, No. 230), the state Labor Relations Act, which makes it unlawful for any person ''by force or unlawful threats to . . . attempt to force any person to become or remain a member of a labor organization, or . . . to refrain from engaging in employment.''

Minnesota: By Stats. Ann., ch. 179, as amended, a comprehensive labor relations statute, it is an unfair labor practice for an employer to sign a closed shop contract without the consent of his employes (*Nemo* v. *Local etc. Board* (1949), 227 Minn. 263 [35 N.W.2d 337, 341]) and apparently picketing to induce such practice could be enjoined (see *Starr* v. *Cooks etc. Union* (1955), 244 Minn. 558 [70 N.W.2d 879]).

Missouri: *Bellerive Country Club.* v. *McVey* (1955), 365 Mo. 477 [284 S.W.2d 492, 500 [2]] [''the right guaranteed to employees by Art. I, Sec. 29, Mo. Const. 1945, 'to organize and to bargain collectively through

have concluded, they can and should provide a remedy against the statutory or constitutional violation, whether such remedy is the enforcement of a commission's cease and desist order

representatives of their own choosing' is a free choice, uncoerced by management . . .''] ; *Swift & Company* v. *Doe* (1958), —— Mo. —— [311 S.W.2d 15, 21 [3]].

New Jersey: N.J. Const., 1947, art I, par. 19, provides, ''Persons in private employment shall have the right to organize and bargain collectively.'' This provision is not implemented by statute, but by the courts. (*Independent D.W. Union* v. *Milk Drivers etc. Local No. 680* (1959), 30 N.J. 173 [152 A.2d 331, 336 [2], 336-337 [3, 4]] [subject type of picketing by stranger union enjoined at suit of freely organized independent union which had been selected as bargaining agent by employes at a secret election conducted by a ''Fair Ballot Association''; the court rejects defendant union's contention that ''the judiciary [should] be inert because it cannot provide a mechanism equal to the task of formulating and effectuating a fair pattern of labor-management relations''] ; *id.* (1958), 49 N.J. Super. 78 [139 A.2d 134] ; *id.* (1956), 23 N.J. 85 [127 A.2d 869, 874-875 [3-4], 875-876 [5, 6]] [''Freedom of choice in selecting one's bargaining agent is the very essence of collective bargaining'' and ''[I]f the protection afforded to insure unfettered organizational processes by our Constitution is to have assistance . . ., the will of the majority may not be undermined by picketing where the sole object is economic duress upon the employer and the employees''].)

New York: *Goodwins, Inc.* v. *Hagedorn* (1951), 303 N.Y. 300 [101 N.E.2d 697, 32 A.L.R.2d 1019, 1021] [the Goodwins holding as to federal preemption no doubt could not stand today, but such holding is not pertinent to our present consideration]; *Wood* v. *O'Grady* (1954), 307 N.Y. 532, 539-540 [122 N.E.2d 386] ; *Pleasant Valley Packing Co.* v. *Talarico* (1958), 5 N.Y.2d 40 [152 N.E.2d 505, 507 [1]]. N. Y. Laws, Ann., 1948, tit. 30, art. 20, § 700 et seq., is a comprehensive Labor Relations Act.

Pennsylvania: *Wilbank* v. *Chester & Delaware etc. Union* (1948), 360 Pa. 48 [60 A.2d 21, 23 [3, 4]] ; *Sansom House Enterprises* v. *Waiters etc. Union* (1955), 382 Pa. 476 [115 A.2d 746, 749 [3]], cert. den., 350 U.S. 896 [76 S.Ct. 155, 100 L.Ed. 788] ; *School District* v. *International Brotherhood* (1958), 316 Pa. 408 [145 A.2d 258, 262]. Pa. Stats. Ann., tit. 43, § 211.1-211.12, is a comprehensive Labor Relations Act.

Washington: *Gazzam* v. *Building Service Employees Union* (1948), 29 Wash.2d 488 [188 P.2d 97, 104, 11 A.L.R.2d 1330], (1949), 34 Wash. 2d 38 [207 P.2d 699], affirmed, *Building Service Union* v. *Gazzam* (1950), 339 U.S. 532, 538-539 [70 S.Ct. 784, 94 L.Ed. 1045], applying an anti-injunction law like that of Indiana, *supra*, and also stating that stranger recognitional picketing violated ''rules of common law'' ; *Audubon Homes* v. *Spokane Bldg. etc. Council* (1956), 49 Wash.2d 145 [298 P.2d 1112, 1115 [1-3]], cert. den., 354 U.S. 942 [77 S.Ct. 1392, 1 L.Ed. 2d 1536].

Wisconsin: *Vogt, Inc.* v. *International Brotherhood of Teamsters* (1956), 270 Wis. 315 [74 N.W.2d 749, 753 [5], 755 [6]], affirmed, *Teamsters Union* v. *Vogt, Inc.* (1957), 354 U.S. 284, 294 [77 S.Ct. 1166, 1 L.Ed.2d 1347]. Wisconsin's comprehensive Employment Peace Act provides (Stat. Ann., § 111.06(2)(b)) that it is an unfair labor practice and against public policy for an employe individually or in concert with others ''To coerce . . . any employer to interfere with any of his employes in the enjoyment of their legal rights, including those guaran-

as spelled out by statute or, in the absence of statute, a typical exercise of the power of equity to enjoin against threatened wrongful infliction of irreparable injury.

Some states have statutes which directly outlaw picketing by a minority or stranger union,[5] and in a few states judi-

teed by section 111.04''; the latter section guarantees to employes the right of self-organization, collective bargaining through representatives of their own choosing, concerted lawful activity, and the right to refrain from any such activities.

Wyoming: *Hagen* v. *Culinary Workers Alliance Local No. 337* (1952), 70 Wyo. 165 [246 P.2d 778, 788 [6]], applying the Wyoming ''Little Norris-LaGuardia Act,'' W.C.S., § 54-501, like the Indiana and Washington statutes, *supra*.

[5]Arizona (also has a ''right-to-work'' law): Rev. Stat. Ann., ch. 8, § 23-1322: ''It shall be unlawful for any labor organization to picket any establishment unless there exists between the employer and the majority of employees of such establishment a bona fide dispute regarding wages or working conditions.''

Colorado: Section 6(2)(e) of the Labor Peace Act (Rev. Stats., ch. 80, art. 5, §§ 1-22) made a strike vote by a majority of the employes of the subject employer a condition precedent of picketing, and section 7(2) provided that the strike vote be taken ''as is provided in this act.'' These sections were held inoperative because the only provision in ''this act'' for a strike vote was in section 20, which in turn was held unconstitutional because it required incorporation of unions. (*American Federation of Labor* v. *Reilly* (1944), 113 Colo. 90 [155 P.2d 145, 150 [9, 10], 160 A.L.R. 873].)

Hawaii: Rev. Laws, 1955, ch. 90, is a comprehensive Employment Relations Act. Section 90-8(e) provides that it is an unfair labor practice for an employe ''To cooperate in engaging in, promoting or inducing picketing (not constituting an exercise of constitutionally guaranteed freedom of speech) . . . unless a majority in a collective bargaining unit of the employees of an employer against whom such acts are primarily directed have voted by secret ballot to call a strike.''

Minnesota: Stat. Ann., § 179.11(4) provides that it is an unfair labor practice ''For any person to picket or cause to be picketed a place of employment of which place the person is not an employee while a strike is in progress affecting the place of employment, unless the majority of persons engaged in picketing the place of employment at these times are employees of the place of employment.''

Montana has a rather unusual statute (Rev. Code Ann., § 41-1801; L. 1959, ch. 160, § 1) which provides that ''a sole proprietor or a member of a partnership consisting of not more than two partners who own a retail or amusement establishment and the members of his immediate family shall have the right to do any work in his place of business without interference by any union or any member thereof.''

Oregon: Rev. Stats., 1953, ch. 662, §§ .610 through .790, a comprehensive labor code, specifically provides (§ .750) that ''It shall be unlawful for any person directly or indirectly to . . . coerce . . . any employee in the exercise of said employee's free choice in selecting or rejecting a labor organization as the representative of employees for the purpose of collective bargaining, or . . . to coerce . . . any employer or employee because employees of said employer . . . have not selected a labor organization as their representative for said purpose. The word 'coerce' includes picketing.'' The constitutionality of this provision was upheld in

cially declared public policy forbids recognitional picketing by such a union.[6] In the many states which have made the union shop illegal by "right-to-work" statutes,[7] picketing to compel execution of a union shop contract is of course for an unlawful object. The states which uphold the legality of

*Gilbertson* v. *Culinary Alliance & Bartenders' Union* (1955), 204 Ore. 326 [282 P.2d 632, 652-653 [15-18]].

Pennsylvania: The state Labor Relations Act (Act of 1947, No. 484) provided that it is a union unfair labor practice for a labor organization or employes "To picket or cause to be picketed a place of employment by a person . . . who is not . . . an employee . . . of the place of employment." (Purdon's Stats. Ann., tit. 43, § 211.6(2)(d).) This statute was held an unconstitutional restraint on freedom of speech because its broad prohibition of picketing by nonemployes "leaves room for no exceptions based upon the lawfulness of the purpose of the picketing, its peaceful character, or the circumstances that the picketers have a legitimate economic interest to advance thereby." (*Pennsylvania Labor Relations Board* v. *Chester & Del. etc. Union* (1949), 361 Pa. 246 [64 A.2d 834, 841 [3]].)

Texas (which has a "right-to-work" law) also sought to narrowly restrict peaceful picketing by the following provisions of Vernon's Ann. Civ. Stat., art. 5154f: "It shall be unlawful for any person . . . to . . . participate in, aid or abet . . . secondary picketing . . . as those terms are defined herein"; i.e., "the act of establishing a picket . . . near the premises of any employer where no labor dispute, as that term is defined in this Act, exists between such employer and his employees. . . . The term 'labor dispute' is limited to . . . any controversy between an employer and the majority of his employees concerning wages, hours or conditions of employment; provided that if any of the employees are members of a labor union, a controversy between such employer and a majority of the employees belonging to such union, concerning wages, hours or conditions of employment, shall be deemed, as to the employee members only of such union, a labor dispute within the meaning of this Act." In *International Union of Operating Engineers* v. *Cox* (1949), 148 Tex. 42 [219 S.W.2d 787, 793 [10-12]], it was held that the foregoing statutory definitions were so narrow as to constitute an unconstitutional deprivation of free speech, but the right to impose reasonable restrictions on peaceful picketing was recognized.

Wisconsin: Stat. Ann., § 111.06(2)(e), like the Hawaii statute, *supra*.

[6]New Hampshire (semble): *White Mt. Freezer Co.* v. *Murphy* (1917), 78 N.H. 398 [101 A. 357, 361 [12], 362 [13]].

Illinois: *Bitzer Motor Co.* v. *Local 604* (1953), 349 Ill.App. 283 [110 N.E.2d 674, 677 [4]].

Ohio: *Chucales* v. *Royalty* (1956), 164 Ohio St. 214 [129 N.E.2d 823, 828 [4]], cert. den., 351 U.S. 926 [76 S.Ct. 781, 100 L.Ed. 1456].

Washington: *Gazzam* v. *Building Service Employees Union* (1948), *supra*, 29 Wash.2d 488 [188 P.2d 97, 104], holds that stranger recognitional picketing violated the "common law" as well as the statute referred to in footnote 4, *supra*.

[7]Alabama: Title 26, Code, § 375(2), (3); see *Alabama Highway Express, Inc.* v. *Local 612* (1959), 268 Ala. 392 [108 So.2d 350, 356].

Arizona: 1946 amendment to Ariz. Const. (implemented by Ariz. Session Laws, 1947, ch. 81, p. 173); upheld in *American Federation of Labor* v. *American Sash & Door Co.* (1948), 67 Ariz. 20 [189 P.2d 912],

recognitional picketing to compel an employer to force a union shop upon an unwilling majority of his employes are few.[8]
In situations preempted to the jurisdiction of the National

affirmed, *American Federation of Labor* v. *American Sash Co.* (1949), 335 U.S. 538 [69 S.Ct. 258, 93 L.Ed. 222, 6 A.L.R.2d 481].

Arkansas: Ark. Const., Amendment 34; Acts of Ark., 1947, Act No. 101; *Self* v. *Taylor* (1950), 217 Ark. 953 [235 S.W.2d 45, 49 [2]].

Florida: Fla. Const. Decl. of Rights, § 12, as amended, 1944; *Local No. 234, etc.* v. *Henley & Beckwith, Inc.* (1953, Fla.), 66 So.2d 818, 820.

Georgia: Laws, 1947, No. 140 (Code Ann. 54-804, 66-9906); *Powers* v. *Courson* (1957), 213 Ga. 20 [96 S.E.2d 577].

Indiana: Acts 1957, ch. 19 (Burns' Ann. Stats. (1957 Supp), § 40-2701 et seq.); see *Smith* v. *General Motors Corp.* (1957), 128 Ind.App. 310 [143 N.E.2d 441, 449 [7]].

Iowa: Laws, 1947, ch. 296 (Code Ann., § 736A.1 et seq.).

Kansas: Kan. Const., art. 15, § 12 (adopted 1958).

Louisiana: The general "right-to-work" law (LSA-R.S. 23:881-23:888; see *Piegts* v. *Amalgamated Meat Cutters* (1955), 228 La. 131 [81 So.2d 835, 838 [1, 2]]) was repealed by Laws 1956, Act 16. Laws 1956, Act 397, is a "right-to-work" law for agricultural workers.

Mississippi: Code Ann., § 6984.5 (Laws, 1954, ch. 249, §§ 1, 2).

Nebraska: Neb. Const., art. XV, §§ 13, 14, 15, adopted in 1946, upheld in *Lincoln Federal Labor Union* v. *Northwestern Iron & Metal Co.* (1948), 149 Neb. 507 [31 N.W.2d 477], affirmed, *Lincoln Union* v. *Northwestern Co.* (1949), 335 U.S. 525 [69 S.Ct. 251, 93 L.Ed. 212, 6 A.L.R.2d 473].

Nevada: Stats. 1953, ch. 1; *Building Trades Council* v. *Bonito* (1955), 71 Nev. 84 [280 P.2d 295, 297 [3]].

North Carolina: N.C. Session Laws, 1947, ch. 328, upheld in *State* v. *Whitaker* (1947), 228 N.C. 352 [45 S.E.2d 860], affirmed, *Lincoln Union* v. *Northwestern Co.* and *Whitaker* v. *North Carolina* (1949), 335 U.S. 525 [69 S.Ct. .251, 93 L.Ed. 212, 6 A.L.R.2d 473].

North Dakota: NDRC, 1949 Supp., § 34-0901; NDRC, 1953 Supp., § 34-0114; *Minor* v. *Bldg. and Constr. Trades Council* (1956), —— N.D. —— [75 N.W.2d 139, 149 [12]].

South Carolina: Code, §§ 40-46 through 40-46.11 (enacted 1954).

South Dakota: Const., art. VI, § 2, as amended 1946; Laws, 1947, ch. 92, §§ 1-3; *Baumgartner's Electric Const. Co.* v. *DeVries* (1958), —— S.D. —— [91 N.W.2d 663, 672-673 [9]].

Tennessee: Public Acts, 1947, ch. 36 (T.C.A. § 50-209); *Finchum Steel Erection Corp.* v. *Local Union 384* (1957), 202 Tenn. 580 [308 S.W.2d 381]; *Farnsworth & Chambers Co.* v. *Local Union 429* (1957), 201 Tenn. 329 [299 S.W.2d 8, 11 [9]], reversed because of federal preemption, 353 U.S. 969 [77 S.Ct. 1051, 1 L.Ed.2d 916].

Texas: Laws 1947, ch. 74 (Vernon's Ann. Civ. St., art. 5207a); *Local Union No. 324* v. *Upshur-Rural Elec. Co-op Corp.* (1953, Tex.Civ. App.) 261 S.W.2d 484, 485 [3].

Utah: Code Ann. §§ 34-16-1 through 34-16-18 (Laws 1955, ch. 54).

Virginia: Acts of Assembly, 1947, ch. 2, upheld in *Plumbers Union* v. *Graham* (1953), 345 U.S. 192, 200-201 [73 S.Ct. 585, 97 L.Ed. 946].

[8]New Mexico: *Romero* v. *Journeymen Barbers* (1958), 63 N.M. 443 [321 P.2d 628, 629], upholds such picketing as a court-declared rule.

Rhode Island: The comprehensive state Labor Relations Act, Gen. Laws, tit. 28, ch. 7 (P. L. 1941, ch. 1066) resembles the Wagner Act (pre-Taft-Hartley). Section 28-7-2 thereof declares the public policy of self-organization and collective bargaining of employes through repre-

Labor Relations Board and the federal courts under the Taft-Hartley Act,[9] however, *N.L.R.B.* v. *Drivers Union Local 639*

sentatives of their own choosing ''free from the interference, restraint or coercion of their employers'' (§ 1) and provides that the act shall not be construed to diminish the right of employes to engage in ''lawful, concerted activities.'' According to *Lindsey Tavern* v. *Hotel & Restaurant Employees* (1956), 85 R.I. 61 [125 A.2d 207, 209, 210 [4]], recognitional picketing, ''unaccompanied by coercion, duress or intimidation, is lawful, . . . even if the picketing union represents no employees of the complainant.''

West Virginia: *Blossom Dairy Co.* v. *International Brotherhood* (1942), 125 W.Va. 165 [23 S.E.2d 645, 649], where no statute is involved, holds (Syllabus 1 by the court, p. 646 of 23 S.E.2d) that ''Picketing of the place of business of an employer by a labor union will not be enjoined on the ground that it tends, or is intended, to cause the breach of a labor contract between such employer and another labor organization, when such picketing is not otherwise unlawful.''

Nevada (prior to enactment in 1953 of a ''right-to-work'' law) may also be mentioned here: *State* ex rel. *Culinary* v. *Eighth Judicial District Court* (1949), 66 Nev. 166 [207 P.2d 990, 996-998 [10-12]], upheld the legality of picketing by an outside union to compel a closed shop agreement under N.C.L., § 10473 (enacted 1911), which provided that ''It shall be unlawful for any person . . . to make . . . any agreement . . . by the terms of which any employee of such person, . . . or any person about to enter the employ of such person, . . . as a condition for continuing or obtaining such employment, shall promise or agree not to become or continue . . ., or . . . to become or continue a member of a labor organization,'' and N.C.L., § 2825.31 (approved 1937), a statutory declaration of policy substantially identical with section 923 of our Labor Code.

[9]Prior to its 1959 amendment section 8 of the Labor Management Relations Act of 1947, as amended (29 U.S.C. § 158), contained among the proscribed unfair labor practices (largely the same as those which, prior to the recent majority decision in the Petri Cleaners case were proscribed in California by Labor Code, section 923, and related sections) the following which are here pertinent:

''(b) It shall be an unfair labor practice for a labor organization or its agents:

''(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 [i.e., rights to self-organization, to bargain collectively through representatives of their own choosing, etc., and also to refrain from such activities except as the latter right may be affected by a union security agreement as authorized in section 8(a)(3)] . . .

''(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) [which provides that it is an unfair labor practice for an employer to discriminate in regard to employment to encourage or discourage membership in any labor organization, except that the employer can enter into a union security agreement as authorized by the act] . . .

''(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to . . . work on any . . . commodities or to perform any services, where an object thereof is: . . . (C) forcing . . . any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified . . .''

(1960), *supra,* 362 U.S. 274 [80 S.Ct. 706, 4 L.Ed. 2d 710] [28 Law Week 4217], has answered negatively the question "whether peaceful picketing by a union, which does not represent a majority of the employees, to compel immediate recognition as the employees' exclusive bargaining agent, is conduct of the union 'to restrain or coerce' the employees in the exercise of rights guaranteed in § 7, and thus an unfair labor practice under § 8(b)(1)(A)." The board there issued a cease and desist order against picketing which continued for six months after the employes of Curtis Bros. voted in favor of "no union." The board proceeded under section 8(b)(1)(A) prior to the 1959 amendment of Taft-Hartley, and although on oral argument to the United States Supreme Court counsel for the board stated that, had the case arisen under the 1959 act, the board might have proceeded under section 8(b)(7) thereof,[10] the majority refused to remand the matter for reconsideration in the light of the new law. The court reaches its conclusion in the following manner:

"[P. 4219 of 28 Law Week.] [T]ension exists between the two rights of employees protected by § 7—their right to form, join or assist labor organizations, and their right to refrain from doing so. . . . The Board stated: 'Because the object of the Union's picketing in this case was to force the Company to commit an act prohibited by the statute itself [that is, to recognize and contract with the Local although it was not the chosen representative of a majority of the Curtis Bros. employees] and directly to deprive the employees of a right expressly guaranteed to them by the same Act, there is no occasion here to balance conflicting interests or rights.'"

---

[10]The 1959 act adds a new union unfair labor practice to section 8(b); i.e., "(7) to picket or cause to be picketed . . . any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees . . . unless such labor organization is currently certified as the representative of such employees:"

(A) where the employer has lawfully recognized another union and a question concerning representation may not appropriately be raised under the act.

(B) where a valid representation election has been conducted in the preceding 12 months.

(C) where the picketing has been conducted without a representation petition being filed with the board "within a reasonable period of time not to exceed thirty days from the commencement of such picketing," with some provisos.

"Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section (8)(b)."

The board's conclusion, *as summarized by the court,* was that "the threat to the employees' job security which was thought to be inherent in the economic pressure directed against the employer . . . was said to taint peaceful picketing as unlawful conduct to 'restrain or coerce' which the Board might forbid."

The high court's opinion continues as follows: "We first consider § 8(b)(1)(A) in the light of § 13 which provides, in substance, that the Taft-Hartley Act shall not be taken as restricting or expanding either the right to strike or the limitations or qualifications on that right, as these were understood prior to 1947, unless 'specifically provided for' in the Act itself.[11] . . . [Before 1947] the full protection of the Norris-La Guardia Act extended to peaceful picketing by minority unions for recognition. [Citations.] Therefore, since the Board's order . . . would obviously 'impede' the right to strike it can only be sustained if such power is 'specifically provided for' in the Taft-Hartley Act, that is, in § 8(b)(1)(A)."

That section does not vest such power in the board. (P. 4220 of 28 Law Week.) The "general standard" of section 8(b)(1)(A) does not overlap the "rather specific" prohibitions of section 8(b)(4). (See particularly § 8(b)(4)(C), quoted *supra*, footnote 9.) The words "restrain or coerce" in section 8(b)(1) constitute "a 'restricted phrase' to be equated with 'threat of reprisal or force or promise of benefit,'" as contrasted with the words "induce or encourage" in section 8(b)(4). And the legislative history of section 8(b)(1)(A) as read by the high federal court does not support the board's view.

Finally, the court says (p. 4222 of 28 Law Week), "We are confirmed in our view by the action of Congress in passing the Labor-Management Reporting and Disclosure Act of 1959. That Act goes beyond the Taft-Hartley Act to legislate a comprehensive code governing organizational strikes and picketing and draws no distinction between 'organizational' and 'recognitional' picketing. . . . Were § 8(b)(1)(A) to

---

"[11]Section 13 provides:

"'Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right.' 61 Stat. 151, 29 U.S.C. § 163.

"Picketing has been equated with striking for the purposes of § 13. [Citations.]"

have the sweep contended for by the Board, the Board might proceed against peaceful picketing in disregard of [the safeguards of § 8(b)(7) of the 1959 act, quoted *supra*, footnote 10]. . . . Courts may properly take into account the later Act when asked to extend the reach of the earlier Act's vague language to the limits which, read literally, the words might permit.''

For the following reasons I cannot regard the foregoing decision as persuasive in its effect on the problem of state law which is under discussion: To me, as to three justices of the federal Supreme Court (p. 4223 of 28 Law Week), section 8(b)(7) of the 1959 federal act "seems squarely to cover the type of conduct involved," and that matter has not been fully and fairly litigated. In any event, it is a generally accepted view that Congress by the 1959 amendments sought to curtail minority or stranger picketing for the purpose of causing organization "from the top." (See John H. Fanning, member of the NLRB, *The New Taft-Hartley Amendments* (1959), 10 Labor Law Journ. 763, 765; Harry H. Rains, New York attorney, *What the New Labor Law Means to Management* (1959), 10 Labor Law Journ. 753, 790-793; Benjamin Wyle, formerly general counsel of the Textile Workers' Union, now member of the Labor Arbitration Committee of the American Bar Association, *The New Law of Picketing* (1959), 10 Labor Law Journ. 889, 891, 894.) Nor am I able to predict what view the high court might take had the picketing in the above case been recognitionally but not organizationally effective and caused Curtis Bros. to violate section 8(a)(3) of the national act. Also I would note that the emphasis placed by the high court upon the protection afforded the subject picketing by the Norris-La Guardia Act prior to 1947 is not pertinent in California, for in 1933 our Legislature refused to pass an anti-injunction bill similar to that act, and instead adopted only its declaration of policy (Lab. Code, § 923) and its provisions against yellow dog and company union activity of the employer.

Therefore, I reiterate my opinion that the majority's concept of "freedom" of self-organization "is definitely opposed not only to the statutes of California but also to widely expressed recent thinking in the field of labor-management-individual workman relations" (Petri dissent, *ante,* p. 480).

Giving effect to the plain language of Labor Code, section 923 and related sections, upholding and applying them as was

done in California prior to the Petri decision, California law was in harmony with that of the vast majority of the sister states (footnotes 4 through 8, *supra*) and with what at least seems to be the clear purport of sections 8(b)(7)(B) and 8(b)(7)(C) of the federal act. In my research I have discovered only three other states (footnote 8, *supra*) which definitely accept the view enunciated by the majority in Petri and reiterated today. The California statutes are, of course, still in our law books, and their clear language is still in harmony with the state law of the majority of states and with the most recent statutory developments of the federal law. Nevertheless, by the decree of four justices who refuse to uphold and apply that which was the established statutory and decisional law of this state, California in intrastate matters is currently retrograded to that small minority of states which persist in maintaining an ungoverned area in labor relations. Thus in California large enterprises which are engaged in interstate commerce have at least some measure of protection under federal law while small businesses, despite our statutory law, are left to "the free [and destructive] interaction of economic forces" (*Petri Cleaners, Inc.* v. *Automotive Employees, etc., Local No. 88* (1960), *supra, ante,* pp. 469, 473) which is more similar to the combat of tooth and nail than to the operation of a governed society.

The broad sweep of the majority's holdings in Petri and in the case at bench—going far beyond the import of the succinct statement of "crucial issue" hereinabove quoted— requires from me some comment upon problems of application of California antitrust law to union price-fixing activities. Such comment appears appropriate because of the manner in which the majority (pp. 885-887, *ante*[12]) treat plaintiff's contention that defendant Local 256 "is not only a labor organization but also a price fixing organization of employers," a combination unlawful under the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) and the common law of this state (*Speegle* v. *Board of Fire Underwriters* (1946), *supra,* 29 Cal.2d 34, 44 [11]). Questions whether defendant was or was not engaged in illegal restraint of competition and price-fixing, or in an attempt to compel plaintiff to agree to such

---

[12]The essence of the majority's holding (pp. 886-887, *ante*) is that "the point of clause thirteen [of the demanded contract] is not price-fixing, but wage-fixing, and the presence of employer-barbers in the union does not convert the contract into an agreement between labor groups and non-labor groups for the purpose of restraining trade."

restraint, were not raised by the pleadings or mentioned in the pretrial order or at the trial and, since they were not presented to the trial court, its findings of fact and conclusions of law are not directed to them.

However, the question of the legality of the contract which was the object of defendants' economic pressure—like the question of the legality of a contract which a plaintiff seeks to enforce or for breach of which he seeks damages (*Morey* v. *Paladini* (1922), 187 Cal. 727, 733-734 [2] [203 P. 760])— can be raised at any stage of the proceeding, and "When the court discovers a fact which indicates that the contract is illegal and ought not to be enforced [or, here, its execution compelled], it will, of its own motion, instigate an inquiry in relation thereto" (*id.*, p. 734 [3] of 187 Cal.).

In the present case the evidence showed and the trial court found that defendant Local 256 "is a labor organization whose membership includes . . . barbers employed by proprietors of barber shops" and also "barbers who are not employees, including operators of barber shops who employ other barbers and a very large number of proprietors of barber shops"; that defendants "were and are seeking to extend the membership of the Defendant Union to all barbers working with the tools of the trade within the territorial jurisdiction of the Defendant Union whether employers or journeymen barbers"; and that the printed form of contract which defendants demanded of plaintiff states, "13. Whereas wages are paid on a percentage basis the prices to be charged under this Agreement in all Union barber shops not to be less than the following: [listing prices]."

There is no finding that the peaceful picketing of plaintiff by Local 256 was part of an effort by such union to induce all employers of barbers and self-employed barbers in the San Diego area to agree to the scale of minimum prices which, according to clause 13 of the form of agreement presented to plaintiff, are "to be charged under this Agreement in all Union barber shops." But the constitution of the Journeymen Barbers, Hairdressers, Cosmetologists and Proprietors' International Union of America, which is in evidence, shows that price-fixing is the method of wage-fixing used by the organization.[13] In these circumstances the question of re-

[13]Among the provisions of the International's constitution are the following:

Article III, section 1: "The General Executive Board of the Interna-

straint of trade is before us, and I am impelled to state the reasons why I cannot join in implications in the majority opinion that the attainment by the local union of a price-fixing agreement with each employer in the San Diego area would be a proper union objective because as to each employer the union would be "acting alone" (*ante,* p. 886) to fix minimum wages, not minimum prices.

If the operator of every barber shop in the territorial jurisdiction of Local 256 were to enter into an agreement with Local 256 to conform to the minimum price scale set by the union then (whether the price scale was agreed to at the request of the operator, the behest of the union, or as a product of collective bargaining) prices would be just as fixed as if the operators, in their capacities as businessmen, had agreed with one another to fix them. To my mind the illegality and undesirability of such a situation could not be removed by saying that no barber shop operator acting as a businessman combined with any other barber shop operator so acting, or that the control of prices was brought about by a labor union which acted for the purpose of fixing wages, and therefore should be deemed beyond the reach of the law. "The law respects form less than substance." (Civ. Code, § 3528.)

The "point" of a union's obtaining from businessmen an agreement such as clause 13 of the form of contract here sought, is that the union had adopted price-fixing as a means of wage-fixing. Such price-fixing is more than a mere inci-

---

tional Union is authorized to grant charters to local unions or employers' guilds . . .

"Sec. 3. In places where more than one union holds a charter, said unions and guilds shall form a joint committee to regulate prices, wages, hours of labor and other working conditions. . . ."

Article VII, section 6: "No Shop recognized as a union shop . . . shall permit the following unfair trade practices: . . . 4. The rendering of any service in the trade area thereof for less than the minimum prices established in said trade area . . .

"Sec. 11. . . . Copies of the working agreement setting forth prices, wages and hours and other working conditions shall be signed by the owner or operator signing the Shop Card agreement . . .

"Sec. 12. The contract, or agreement, called for by these laws shall be so construed that the person . . . displaying the Shop Card shall specifically agree: . . . (b) To abide by the laws of the local union . . . with reference to prices, hours, wages, and working conditions. . . ."

Article XV, section 1. "Every local union or guild may make its own by-laws, which must, however, be in accordance with this Constitution. . . .

"Sec. 5. Every local union shall regulate the hours of labor, prices and wages in their respective locality . . ."

dent reasonably related to the proper union objective of securing a wage scale;[14] it is the very heart of the wage-fixing method chosen by the union. The line which unions cannot pass in restraining trade may sometimes be obscure but in such a situation, I think, the union would clearly have gone beyond that line. (*De Neri* v. *Gene Louis, Inc.* (1941), 261 App.Div. 920 [25 N.Y.S.2d 463], affirming (1940), 174 Misc. 1000 [21 N.Y.S.2d 993, 995], modified on other grounds, (1942), 288 N.Y. 592 [42 N.E.2d 602]; *Reinman* v. *Jaffe* (1952), 280 App.Div. 837 [113 N.Y.S.2d 716, 717 [2, 3]]; *Commonwealth* v. *McHugh* (1950), 326 Mass. 249 [93 N.E.2d 751, 760 [8, 9]]; *Robison* v. *Hotel & Restaurant Employees* (1922), 35 Idaho 439 [207 P. 132, 136] [where ''[t]he purpose of [concerted union activity] was, not to fix the price, or regulate the production of any article of trade or commerce, but to better their own economic condition''].)

As this court, speaking through Mr. Justice Traynor, unanimously recognized in *Speegle* v. *Board of Fire Underwriters* (1946), *supra*, 29 Cal.2d 34, 44, 45, ''The public interest requires free competition so that prices be not dependent upon an understanding among suppliers of any given commodity, but upon the interplay of the economic forces of supply and demand,'' and ''[C]ombinations between employers and employees present a particularly effective means of stifling competition.'' Despite the dissimilarity between occupations of the persons in the Speegle case and those in this case, the foregoing statements of facts of economic life are true here if they were true there. And even if, as stated by the majority in the Petri Cleaners case (*ante*, p. 469), ''An employer's decision whether or not to bargain with a labor organization has long been determined in this state by the free interaction of economic forces,'' there are in the opinion of the same majority today strong implications that the price of haircuts is not to be so determined.

And if a union can fix minimum prices of a service commodity as a means of fixing minimum wages, then why should

---

[14]Pertinent here is the view taken by the NLRB in making a cease and desist order as to conduct which it determined was a Taft-Hartley-defined unfair labor practice, and by the United States Supreme Court in upholding the board's determination, in *National Labor Relations Board* v. *Denver Bldg. & Const. Trades Council* (1951), 341 U.S. 675, 688, 689 [71 S.Ct. 943, 95 L.Ed. 1284]. The board found ''That *an* object, if not the only object, of what transpired'' was the proscribed unfair labor practice; the high court accepted this finding and held that ''It is not necessary to find that the *sole* object of the strike was that [proscribed by the national act].''

it not fix maximum prices so as to prevent employers from pricing themselves out of the market, decreasing the number of their customers, and thus being compelled to reduce the number of their employes? Or if a union of workers who furnish a service commodity can fix minimum prices of such commodity so as to establish a wage based on a percentage of the price of the service produced by the worker, why should not a union of workers who make objects of trade adopt a similar method of fixing wages by fixing the price at which the employer shall sell the objects? In such a situation there would be literally, and in my opinion, as a matter of law, a "combination of capital, skill or acts by two or more persons" for the forbidden purpose of fixing prices (Bus. & Prof. Code, § 16720), with the union its nexus.

I recognize that the United States Supreme Court has taken a different view of the Sherman Act as amended by the Clayton Act (and as inevitably affected by the Norris-La Guardia, Wagner, and Taft-Hartley Acts) from that which I suggest concerning the Cartwright Act. (*Allen Bradley Co.* v. *Local Union No. 3* (1945), 325 U.S. 797, 809, 810 [65 S.Ct. 1533, 89 L.Ed. 1939].) Under federal law a union can combine to restrain commerce when it acts "alone" (e.g., does not enter into a competition-restraining agreement with a group of employers but rather "picks off" such employers one by one) and in union self-interest (e.g., to destroy an employer's business because of "personal antagonism" rather than to better working conditions; *Hunt* v. *Crumboch* (1945), 325 U.S. 821, 824-825 [65 S.Ct. 1545, 89 L.Ed. 1954]). I am not here concerned with and express no opinion as to the relevance of morals and emotions to some hypothetical case. I am concerned with, and cannot join in, implications of the majority that this court under California law should reach the same result concerning the propriety of a union which acts "alone" to restrain trade as the United States Supreme Court apparently has felt compelled to reach in reconciling federal acts which declare the policies of Congress on the one hand "to preserve a competitive business economy" and on the other hand "to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining" (*Allen Bradley Co.* v. *Local Union No. 3* (1945), *supra*, p. 806 of 325 U.S.).

Probably the California courts when they originally announced that the common law of this state forbade combina-

tions in restraint of trade (e.g., *Santa Clara Valley Mill & Lumber Co.* v. *Hayes* (1888), 76 Cal. 387, 392 [18 P. 391, 9 Am.St.Rep. 211]) and the Legislature when it enacted the Cartwright Act (Stats. 1907, ch. 530) were chiefly concerned with the dangers of combination of businessmen-capitalists, not of laborers (see similar comment as to the 1890 enactment of the Sherman Act in *Apex Hosiery Co.* v. *Leader* (1940), 310 U.S. 469, 492 [60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044], although during the congressional debates preceding adoption of the Sherman Act, an amendment exempting labor unions was offered and rejected; see *Loewe* v. *Lawlor* (1908), 208 U.S. 274, 301 [28 S.Ct. 301, 52 L.Ed. 488], the Danbury Hatters' case). And probably the dangers of combinations among businessmen and organized labor to restrain trade were not much in the minds of the courts when they originally announced that under the common law of this state workmen could combine and act in concert against employers to better working conditions (*J. F. Parkinson Co.* v. *Building Trades Council* (1908), 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A.N.S. 550]), or much in the minds of the legislators when, recognizing that literally the Cartwright Act could be applied to outlaw labor unions, they promptly amended such act (Stats. 1909, ch. 362) to provide that labor was not a commodity within its meaning. But in *Overland Pub. Co.* v. *H. S. Crocker Co.* (1924), 193 Cal. 109, 115 [4], 117 [5, 6] [222 P. 812], this court was confronted with a combination between a price-fixing trade association and unions of workmen employed in the trade, by virtue of which combination the union employes of plaintiff, a businessman who refused to join the trade association, were called out for the purpose of compelling plaintiff to join such association or be destroyed. The court determined that the combination violated the Cartwright Act, and that neither that act's provision that labor was not a commodity within its meaning, nor the common-law right of workmen to organize and act in concert for betterment of their working conditions, gave immunity to the subject restraint of trade.

In today's economy we are confronted with new alignments which have the inevitable effect, if not the avowed purpose, of restraining trade. The union's role in such alignments is neither that of a helpless tool of a combination of capitalists nor that of willing and equal coconspirator with businessmen. Rather, the union assumes the initiative and attempts to coerce

businessmen to restrain trade. I think (paraphrasing language of the Allen Bradley Co. case (1945), *supra*, p. 808 of 325 U.S., with reference to the Sherman Act) that the California Legislature never intended that unions could, consistently with the Cartwright Act, coerce employers—including employers who are also working union members—to control the prices of goods and services; this principle is even more obviously true in respect to the many barber shops wherein there are no real employes and all service is furnished by the proprietors themselves.

As pointed out in my dissent in Petri (*ante,* pp. 475-476, 477-479), the majority there declined to give effect either to the decisional principles of *stare decisis* or to the statutory law as enacted in Labor Code, section 923 and related sections; today, as hereinabove shown, to the statutory law to be disregarded in labor relations cases, the same majority add the Cartwright Act. Daniel Webster said, at the funeral of Justice Story, "Justice is the great interest of man on earth." Regrettably, justice is not served by the majority's decision in Petri or their decision today.

By departing lightly from the principle of *stare decisis* the majority, in my view, strike at the stability of the law and the certainty with which its effect may be known; likewise, by failing to evenhandedly uphold and apply a valid statute, whether liked or disliked by the individual justices, they contribute further to the uncertainties of the law. And by refusing to accept the findings of basic facts and the drawing of reasonable inferences of ultimate, legally operative facts by a trial judge whose determinations in this regard rest upon evidence which, according to normal rules of appellate review, is legally sufficient, the majority encourage appeals—already too frequent—which improperly seek appellate invasion of the province of the trial judge, jury, or administrative fact-finder. All this, I fear, must tend not only to increase the financial burdens of litigants, the case loads of courts, and the delays of the law but also, inevitably, to depreciate the esteem in which the law and its servitors—the courts and the judges and the lawyers—are held. It seems reasonable to suppose that the public will accord no higher respect to this court's decisions than the court itself examples.

For the reasons above stated, I would affirm the judgment.

Spence, J., and McComb, J., concurred.